645 So.2d 513 (1994)
Jim SMITH, Individually, Appellant/Cross-Appellee,
v.
Bob CRAWFORD, Appellee/Cross-Appellant, and
The Democratic Party of Florida, the Republican Party of Florida, Jim Smith, as Secretary of State, Appellees.
No. 94-3240.
District Court of Appeal of Florida, First District.
October 26, 1994.
*515 Barry Richard of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, Tallahassee, for appellant/cross-appellee Jim Smith.
Karen Gievers of Karen A. Gievers, P.A., Miami, for appellee/cross-appellant.
John French of Pennington & Haben, P.A., Tallahassee, for appellee the Democratic Party of Florida.
No appearance for the Republican Party of Florida and Jim Smith, as Secretary of State.
ZEHMER, Chief Judge.
Jim Smith, defendant in the proceeding below, appeals in his individual capacity the Partial Final Order Declaring Rights Relating to Campaign Contributions and Campaign Financing entered by the Circuit Court of the Second Judicial Circuit on October 5, 1994. Bob Crawford, plaintiff in the proceeding below, cross appeals the Partial Final Order Declaring Rights on the Issue of Qualification for Office entered by the circuit court on September 22, 1994. The Democratic Party of Florida, an intervenor in the proceedings below, joins with Appellee Crawford in opposing the Smith appeal and seeking reversal of the September 22 order. The Republican Party of Florida, an intervenor in the proceedings below, and Jim Smith, named as a defendant in his capacity as Secretary of State in the proceedings below, have not filed an appearance in this appeal.[1] The notices of appeal in this action were filed on October 7, 1994. On that same day, this Court held a case management conference with counsel to consider the parties' motions to expedite appellate proceedings and entered an agreed order that expedited the briefing schedule and oral argument date. Having heard oral argument on October 12, 1994, presented by counsel for Smith, Crawford, and the Democratic Party, on October 13, 1994, we rendered a summary order wherein the trial court's September 22 order was affirmed and its October 5 order was reversed. The order recited that this opinion would follow shortly to explain the rationale for our decision. A copy of our October 13, 1994, order is attached as Appendix A.
The issues addressed in this appeal and cross appeal are:
(1) Did the trial court err in determining that Jim Smith was qualified to be nominated by the Republican Party to fill a vacancy in the Republican nomination for the office of Commissioner of Agriculture?
(2) Did the trial court err in ruling that Jim Smith was not qualified to receive public campaign financing in his present campaign for Commissioner of Agriculture because he had received public campaign financing in his race for Governor of Florida and his campaign expenditures in that race exceeded $2,000,000?
(3) Did the trial Court err in ruling that Jim Smith was required by the Florida Election Campaign Financing Act, sections 106.30 through 106.36, Florida Statutes (1993) (the "Act"), to repay the Election Campaign Financing Trust Fund (the "Trust Fund") an amount equal to the public campaign funds that he received with respect to expenditures made in his gubernatorial campaign in excess of the $2,000,000 spending limit applicable to candidates for a cabinet office?

*516 (4) Did the trial court err in ruling that Bob Crawford is entitled by section 106.355 of the Act to obtain matching funds from the Trust Fund as a result of campaign contributions that Jim Smith received in his campaign for Governor?
(5) Did the trial court err in ruling that Jim Smith must return campaign contributions received in his campaign for Governor from any contributors affiliated with food outlet or convenience store businesses that are restricted in their contributions to candidates for Commissioner of Agriculture by section 106.082, Florida Statutes (1993), to the extent that those contributions exceed a total of $100 for the entire election year?
We answer the first issue in the negative and the remainder of the issues in the affirmative.

I.
On July 18, 1994, Jim Smith, who currently serves as Florida's Secretary of State, filed his papers to qualify as a candidate for Governor pursuant to the requirements of the Florida Election Code. Candidate Jim Smith, during his campaign for Governor, participated in public election campaign financing pursuant to section 106.33 of the Act. After placing a distant second in the Republican primary for Governor, Jim Smith withdrew his candidacy for Governor. During his gubernatorial campaign to become the Republican nominee, he and his running mate for Lieutenant Governor expended a total of $2,219,859.57. The maximum expenditure limit for a candidate for Governor who requests contributions from the Trust Fund is $5,000,000 in both primary elections and the general election. § 106.34, Fla. Stat. (1993). Upon withdrawal from the race for Governor, Jim Smith immediately ceased receiving any further contributions and took steps to close his campaign accounts, including earmarking for payment to the state of surplus funds in the campaign account as required by statute because he had received funds under the Act.
Bob Crawford, the incumbent Commissioner of Agriculture, qualified as a Democrat to run for reelection to another term of office. No other Democrat qualified to run against him, and he is the Democratic Party nominee for election to that cabinet position. On July 22, 1994, Frank Darden qualified as a Republican candidate to run for this same office. No other candidate qualified as a Republican to run against Mr. Darden, and he became the Republican nominee for Commissioner of Agriculture. Because both Mr. Crawford and Mr. Darden were unopposed, no primary election was held for this cabinet post.
On September 15, 1994, the Republican Party of Florida sought an opinion from the Division of Elections of the Florida Department of State as to whether a vacancy in a cabinet race could be filled by that party through the nomination of a candidate who had been defeated in or had withdrawn from the race for Governor; and, if such a former gubernatorial candidate were to be so nominated, whether expenditures by that candidate in the gubernatorial race would be required to be counted toward the $2,000,000 limit for cabinet officers under the Act. On September 16, 1994, the Division of Elections rendered, as authorized in subsection 106.23(2), Florida Statutes (1993), Advisory Opinion DE 94-17 advising that, if a present candidate for cabinet office withdrew his candidacy after September 15, the Republican Party could designate as the nominee of the party for this cabinet office a former candidate for Governor in the 1994 race who had accepted public financing pursuant to the Act, but who no longer was a gubernatorial candidate due to either defeat during the first primary election or withdrawal from the race for Governor after that election. The opinion further advised:
[T]he mere fact that candidate A [a former gubernatorial candidate] used public financing in his gubernatorial bid and subsequently commenced a bid for a cabinet office does not constitute a violation of the election laws of this state... .
However, ... because candidate A received public financing in his gubernatorial bid, he is required to return all surplus funds from that campaign to the Fund and may not transfer these funds to his cabinet campaign. [Citation omitted.]
... .

*517 ... [c]andidate A's expenditures in his gubernatorial bid will not be counted toward the $2-million limit for cabinet officers in the Act if he is designated to fill the vacancy created by candidate B's [the present Republican nominee for this cabinet position] withdrawal... .
These expenditure limits are for each race and are not cumulative if a former candidate is a candidate for another office under the circumstances you have described.
On September 16, 1994, Frank Darden withdrew his candidacy thereby leaving a vacancy in the Republican nomination for Commissioner of Agriculture. The Republican Executive Committee, pursuant to party rules, then nominated Jim Smith to fill this vacancy. He accepted, filed his qualifying papers, and requested participation in public campaign financing under the Act.

II.
On September 19, 1994, Bob Crawford filed this action in the Leon County circuit court seeking declaratory and injunctive relief based on his challenge to Jim Smith's eligibility to be the Republican Party's nominee for Commissioner of Agriculture. On September 22, 1994, following a hearing held the previous day, the trial court entered a partial final order declaring that Jim Smith's candidacy for Commissioner of Agriculture was not barred by any provision of the Florida Election Code. The trial court order retained jurisdiction to resolve any issues regarding campaign financing and permitted Crawford to amend his complaint to seek declaratory relief regarding those issues.
Bob Crawford then filed a supplement to his complaint challenging Jim Smith's right to participate in public campaign financing under the Act in his campaign for Commissioner of Agriculture. Following a September 30, 1994, evidentiary hearing on the issues so raised, on October 5, 1994, the trial court issued a partial final order ruling that:
(a) all moneys expended by Jim Smith and his running mate in the gubernatorial race would be treated as having been spent in his current race for Commissioner of Agriculture;
(b) Jim Smith is not qualified to receive public campaign financing in his present campaign for Commissioner of Agriculture because the Act does not provide separate benefits for a candidate deciding to run for two different offices during the same election year;
(c) Jim Smith may proceed as a candidate for Commissioner of Agriculture who is not participating in public financing under the Act, and he is not bound by the campaign spending limits under the Act, notwithstanding Jim Smith's stated election to participate;
(d) Jim Smith must repay the Trust Fund an amount equal to the public campaign funds that he received in his gubernatorial race relating to his expenditures in that race over the $2,000,000 spending limit established in subsection 106.34(1)(b), applying to candidates for cabinet officers;
(e) Bob Crawford has a right, pursuant to section 106.355, to obtain public matching funds for those campaign contributions that Jim Smith received in his gubernatorial race in excess of $2,000,000 and, because Jim Smith has already exceeded the $2,000,000 limit, Bob Crawford is entitled to receive matching funds immediately; and,
(f) Jim Smith must return all contributions from any contributor regulated by section 106.082, to the extent that they exceed the total of $100 for the entire election year.
In reaching these conclusions, the trial court recited that "[t]here is nothing in the Florida Election Campaign Financing Act that directly answers the question" presented in this case, and that "the proper application of the statute cannot be determined by a reading of the language used by the legislature... ." Stating that "[s]everal established principles of statutory construction demonstrate that the plaintiff's [Crawford's] interpretation is correct," the court declined to follow the Division's advisory opinion, explaining that the court "cannot give the opinion much weight under the circumstances [because] Jim Smith is both the head of the agency that rendered the opinion and the person who would benefit by the opinion."
*518 Declining to ascertain the meaning of the statute from a plain reading of its language and rejecting the opinion of the agency charged with statutory authority to interpret the Act, the trial court proceeded to fashion a scheme that would, in the trial court's opinion, establish an equitable and fair distribution of public moneys to both candidates in an effort to ensure that "the rights of the parties will be in balance." Although referring to the language of intent found in section 106.31,[2] the trial court concluded that:
The object of the statute, as explained in this section, is to ensure that public office does not become the exclusive domain of the wealthy and the connected. The statute is plainly designed to prevent one candidate from gaining an advantage over another simply on the basis of financial support. Given this general expression of intent, it is unlikely the legislature intended to allow a candidate to gain an advantage by withdrawing from one race after substantial campaign expenditures and starting over in another race with a new campaign spending limit. To allow Jim Smith to start fresh at the beginning of a new campaign spending limit when he already has a 2.2 million dollar head start in media exposure would defeat the very purpose of the law.
The trial court recited that "doubts or ambiguities in a law that grants a benefit or privilege must be resolved in favor of the State and against the person claiming the benefit or privilege," and concluded that
the grant, under Section 106.30, Florida Statutes, et seq., of the opportunity to receive public funds to finance election campaigns should be construed strictly, and doubts resolved against the candidate seeking to obtain the funds from the State.
Applying this principle of strict construction[3] to the present case, the trial court stated:
There must be something in the law that expressly creates an entitlement to the benefit or it should not be paid. Nothing in the statute directly authorizes the defendant [Smith] to increase the total campaign spending limit available to a single candidate by running in more than one race. To the extent that the law is ambiguous on this point, the ambiguity must be resolved against Jim Smith because he is the party claiming the benefit.
Based on the above reasoning, the trial court concluded that
campaign funds Jim Smith received in the gubernatorial race in excess of the campaign contribution limit that would have applied to those contributors if Jim Smith had been running for Commissioner of Agriculture must now be counted in computing the limits in the agriculture race.
The trial court then expanded on this reasoning and determined that the special campaign contribution limits in section 106.082, applicable only to campaigns for Commissioner of Agriculture, must also be applied to contributions received in Smith's campaign for Governor.[4] The trial court acknowledged *519 that "these contributions were not illegal at the time they were made because the $100.00 limit in Section 106.082 does not apply to the office of Governor," but nonetheless applied section 106.082 to invalidate any such gubernatorial contributions to Smith, reasoning that:
[a] determination that Jim Smith could accept $500.00 from a convenience store owner in his race for Governor (because that was legal at the time) and that he could then accept an additional $100.00 in his race for Commissioner of Agriculture (because that is a new race) would defeat the purpose of the law.
We note, however, that there is no finding of fact and no evidence in the record establishing that Jim Smith received in his gubernatorial campaign contributions from any contributor regulated by chapter 500 who would fall within the proscription in section 106.082.

III.
The circuit court had jurisdiction to entertain the issues raised below pursuant to sections 26.012 and 86.011, Florida Statutes (1993), and this court has jurisdiction to review the subject orders pursuant to article V, subsection 4(b)(1), Florida Constitution, and rule 9.030(b)(1)(A), Florida Rules of Appellate Procedure. We conclude that under the unique circumstances in this case Bob Crawford was not required to first pursue administrative remedies.

A.
Addressing first the order of September 22, 1994, we affirm the trial court's ruling that Jim Smith is not prohibited by the Florida Election Code from qualifying as the Republican Party's nominee for the office of Commissioner of Agriculture. We do so, not only for the reasons stated in the order of September 22, but also out of deference to the advisory opinion to this effect issued by the Division of Elections, with which we agree.
Subsections 100.111(4), (5), and (6), Florida Statutes (1993), set forth provisions for filling a vacancy in a nomination for elected office that occurs by reason of "death, resignation, withdrawal, removal, or any other cause or event" and, in effect, leaves a political party without a candidate for such office. Because the vacancy in the Republican Party's nomination for the office of Commissioner of Agriculture occurred after September 15, 1994, subsection 100.111(4)(b) applies. That subsection authorizes the party's executive committee to fill a vacancy in nomination. Subsection (4)(c) contemplates that when a vacancy in nomination is filled in this manner, the nominee must qualify for the newly designated office and must "pay the same filing fee and take the same oath as he would have taken had he regularly qualified for election to such office." In other words, the candidate for the newly designated office must commence a totally new campaign.
Nothing contained in the statutory language in chapter 106 prohibits the party executive committee from filling a vacancy in nomination by nominating a person who had previously been qualified and had campaigned for another office during the same election year, but subsequently withdrew from the first race. On the contrary, the possibility that a candidate for one office can later change the office for which he is a candidate as the party nominee is explicitly contemplated by subsection 106.021(1)(a), which provides:
Nothing in this subsection shall prohibit a candidate, at a later date, from changing the designation of the office for which he is a candidate. However, if a candidate changes the designated office for which he is a candidate, he must notify all contributors in writing of his intent to seek a different office and offer to return pro rata, upon their request, those contributions given in support of the original office sought.
This subsection further provides that any contributions not requested by contributors to be returned within the statutory time period "may be used by the candidate for the newly designated office." From this clear statutory language one can arrive at only a single meaning of the statute  that a candidate who withdraws from one race can legally become a candidate for a newly designated office for which such candidate may duly qualify.
*520 The trial court properly rejected Bob Crawford's argument that the plain language of subsection 99.012(2), Florida Statutes (1993), prohibits any person who has qualified to run for political office from later withdrawing from that race and qualifying to run for any other office during the same election year. Mr. Crawford's argument was predicated on the language of subsection 99.012(2), which provides:
No person may qualify as a candidate for more than one public office, whether federal, state, district, county, or municipal, if the terms of any part thereof run concurrently with each other.
The trial court correctly construed that subsection as follows:
A more reasonable interpretation of Section 99.012(2) is that it prohibits a candidate from qualifying for more than one public office at a time. This interpretation is supported by the history of the law as well as the context provided by the Florida Election Code as a whole. In State of Florida ex rel. Fair v. Adams, 139 So.2d 879 (Fla. 1962), the Florida Supreme Court held that a candidate could not qualify for more than one public office at a time. Although the issue was not governed by any statute, the court concluded that "multiple candidacies are not consistent with the public policy of this state." However, the court was prohibiting only simultaneous qualifications and not sequential qualifications. To make this point clear, Chief Justice Roberts said:
We think though that in all fairness a candidate, who has qualified to become a political party's nominee for a certain office, should have the right to change his mind and thereafter qualify, during the period fixed by law for qualification of candidates, for selection by his party as its nominee for a different office. However, as a condition precedent to such action he should be required to withdraw or abandon his original or prior qualification for candidacy in the primary election.
This passage of the opinion in Adams gives some indication of the meaning of the statute at issue in this case. Section 99.012(2) was enacted in its original form shortly after the Adams decision apparently to prevent the situation that gave rise to that case. It has become a closely related part of what is now known as the "Resign-to-Run" law, Section 99.012(3), Florida Statutes. There can be no question about the fact that the "Resign-to-Run" law was intended to prevent a candidate from seeking one public office at the time that candidate holds another.
The Division of Elections has interpreted Section 99.012(2) to prohibit simultaneous qualifications for more than one office but not sequential qualifications for more than one office. See Division of Elections opinion DE 78-38, Sept. 1, 1978. (Defendant's Exh. 1). As the defendants point out, the court is required to give great weight to the agency's interpretation of the law. [Citations omitted]. There is a natural temptation to make an exception to this rule, at least with respect to the current interpretation provided to Chairman Slade, inasmuch as the Candidate in question is also the Cabinet Officer of the Agency rendering the opinion. However, the interpretation by the Division of Elections in 1978 is consistent with the advice given by to [sic] the Republican Party and the earlier opinion was rendered by unrelated parties.
Although there is at least some doubt about the meaning of Section 99.012(2), that doubt should be resolved in favor of holding a free and competitive election. The right to vote is among the most important rights we all share as Floridians and as Americans. Judges must be very careful in determining whether a candidate nominated by a political party is legally qualified to run for office because the effect of a mistake could disenfranchise a large segment of the population. Thus, the law requires judges to resolve doubts about qualification of a political candidate in favor of the candidate. Irvin v. Collins, 85 So.2d 852 (Fla. 1956).
We agree with this analysis and conclude, as did the trial court, that Jim Smith was not prohibited by the election laws from qualifying as a candidate for Commissioner of Agriculture *521 after withdrawing from the gubernatorial race.

B.
We now address the issues raised by the order of October 5, 1994, involving the application of the Act to the race for office of Commissioner of Agriculture in light of Jim Smith's prior campaign for Governor and the public financing he received in that campaign. We hold that the trial court erred in ruling that the contributions received and the expenditures made by Jim Smith and his running mate in the gubernatorial race must be treated as though they had been received and made in the race for Commissioner of Agriculture. The trial court's error in this regard lies primarily in failing to give required deference to the advisory opinion of the Division of Elections, in failing to read all of the provisions of the election statutes in pari materia, and in failing to give effect to statutory provisions that clearly provide that Jim Smith could withdraw from one campaign and thereafter engage in a completely separate campaign for a newly designated office with separate financing of his campaign for such office.
The Division of Elections is statutorily charged with the administration of the provisions of chapter 106, Florida Statutes, governing campaign financing. It is explicitly authorized to issue advisory opinions construing the provisions of this chapter. §§ 106.22-.23, Fla. Stat. (1993). Subsection 106.23(2) provides that the Division's "opinion, until amended or revoked, shall be binding on any person or organization who sought the opinion or with reference to whom the opinion was sought, unless material facts were omitted or misstated in the request for the advisory opinion." This statutory provision thus contemplates that the opinion remains binding until properly amended or revoked by the Division itself, or invalidated by a court having jurisdiction of the matter.
On September 16, 1994, the Division issued Advisory Opinion DE 94-17 dealing with the issues in this case. No review of the Division's advisory opinion was sought and, accordingly, the opinion remains in effect so far as the Division and the parties bound by it are concerned. While the advisory opinion was not necessarily binding on Bob Crawford, as he was not a party who sought the opinion or a person with reference to whom the opinion was sought, nevertheless, as the trial court recognized in its September 22 order, in construing and applying these statutory provisions a court is required to give deference and great weight to the agency's construction of the statutes it is charged with administering, and a court is not authorized to overturn the agency's determination unless it is "contrary to the language of the statute," Greyhound Lines, Inc. v. Yarborough, 275 So.2d 1, 3 (Fla. 1973), or "clearly erroneous," Department of Professional Regulation v. Durrani, 455 So.2d 515, 517 (Fla. 1st DCA 1984). If the agency's construction "is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute." Ford Motor Co. v. N.L.R.B., 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). Deference to an agency's interpretation is even more compelling where an agency's interpretation, as here, is consistent with its prior published opinions.[5]
In our view, the Division's advisory opinion correctly interprets the relevant statutory provisions of the campaign financing law as providing that a campaign for a prior office from which the candidate has withdrawn must be treated as a separate event from a campaign for a newly designated office. The Division advised that:
[C]andidate A's expenditures in his gubernatorial bid will not be counted toward the $2-million limit for cabinet officers in the Act if he is designated to fill the vacancy created by candidate B's withdrawal. Contributions received by candidate A in his terminated gubernatorial bid are irrelevant to a later bid for a cabinet office, inasmuch as such funds must either have been spent in pursuit of the gubernatorial bid or be returned to the Fund.
The campaign expenditure limitations for a candidate requesting contributions from the Fund are found in Section 106.34, Florida *522 Statutes. These expenditure limits provide that a candidate for governor must limit his total expenditures to $5-million, and a candidate for cabinet office must limit his total expenditures to $2-million. The expenditure limits are for each race and are not cumulative if a former candidate is a candidate for another office under the circumstances you have described.
The circuit court rejected the Division's interpretation of the statute in this advisory opinion on grounds of an alleged conflict of interest because the Division falls within the Department of State currently headed by Mr. Smith as Secretary of State. This was error because the record shows that Mr. Smith was not involved and did not participate in any way in the preparation of that opinion or review and approve it before it was released.[6] Section 106.23 does not require that the Secretary of State personally participate in the preparation of advisory opinions or that he review and approve an opinion before its release by the Division. Even if the statute did so require, section 120.72, Florida Statutes (1993), provides that an agency head can be recused in the event of a conflict of interest so as to allow the agency to act as required by law; however, no party has insisted on pursuing relief under that statute.[7] In sum, there is no evidence in this record that suggests any impropriety on the part of Jim Smith or the Division of Elections with respect to the preparation and issuance of this advisory opinion, and the trial court erred in disregarding it for the reason stated.
In any event, we agree that the Division's advisory opinion reads the statute correctly. We begin with "the cardinal rule of statutory construction ... that the courts will give a statute its plain and ordinary meaning," Weber v. Dobbins, 616 So.2d 956, 958 (Fla. 1993), and "the basic rule of statutory construction that statutes which relate to the same or to a closely related subject or object are regarded as in pari materia and should be construed together and compared with each other." Ferguson v. State, 377 So.2d 709, 710 (Fla. 1979). As the supreme court has recognized for many years:
Surely, the purpose of all rules relating to the construction of statutes is to discover the true intention of the law. But such rules are useful only in case of doubt and should never be used to create doubt, only to remove it. Where the legislative intent as evidenced by a statute is plain and unambiguous, then there is no necessity for any construction or interpretation of the statute, and the courts need only give effect to the plain meaning of its terms. This Court, in Van Pelt v. Hilliard, held:
"The Legislature must be understood to mean what it has plainly expressed, and this excludes construction. The legislative intent being plainly expressed, so that the act read by itself or in connection with other statutes pertaining to the same subject is clear, certain, and unambiguous, the courts have only the simple and obvious duty to enforce the law according to its terms. Cases cannot be included or excluded merely because there is intrinsically no reason against it. Even where a court is convinced that the Legislature really meant and intended something not expressed in the phraseology of the act, it will not deem itself authorized to depart from the plain meaning of the language which is free from ambiguity. If a legislative enactment violates no constitutional provision or principle, it must be deemed its own sufficient and conclusive evidence of the justice, propriety, and policy of its passage. Courts have then no power to set it aside or evade its operation by forced and unreasonable construction. If it has been passed improvidently the responsibility is with the Legislature and not the *523 courts. Whether the law be expressed in general or limited terms, the Legislature should be held to mean what they have plainly expressed, and consequently no room is left for construction...."
State v. Egan, 287 So.2d 1, 4 (Fla. 1973) (Citations omitted). See also Perkins v. State, 630 So.2d 1180, 1182 (Fla. 1st DCA 1994).
The statutory meaning in this case is clear and unambiguous from a reading of the plain words of the statutes: a candidate for a particular office may withdraw from that race and enter the race for a newly designated office regardless of the receipt of public campaign funds from the Trust Fund; and the campaign contributions received in connection with the first campaign, whether private contributions or funds received from the Trust Fund, and the expenditures in the first campaign, must be kept separate and accounted for independently of the contributions and expenditures in the second campaign. We conclude that this is the only permissible interpretation of the statutory provisions for the following reasons.
As discussed above, section 106.021 explicitly authorizes a candidate to change the designation of the office he or she seeks; but that section also requires that contributions received in the first campaign cannot be carried over and applied to the second campaign unless the contributors give their consent. This consent requirement manifests unambiguous legislative intent that the campaign contributions in the first race cannot be applied to a campaign for a newly designated office unless contributors separately indicate their willingness to support the candidate's new campaign by giving their consent to such use. A candidate for a newly designated office must qualify and conduct a campaign for that office completely independently of any former campaign for another office, and this is especially true when such candidate has received public campaign funds under the Act. Thus, whenever a candidate withdraws from a race and has surplus funds remaining in that campaign account, disposition of those funds must be accomplished in accordance with the limitations provided in sections 106.11 and 106.141, Florida Statutes (1993). Neither of these statutes authorizes funds from the first campaign to be expended for the second campaign. On the contrary, section 106.141 clearly prohibits the expenditure of any such surplus funds in the campaign for the newly designated office. Subsection 106.141(1) requires prompt disposition of such surplus funds and prohibits the withdrawing candidate from accepting any additional contributions. Although surplus contributions received by a withdrawing candidate who has not participated in public campaign financing under the Act are authorized to be used by the candidate, under certain circumstances, in the race for the newly designated office, the same is not true for candidates who have received public funds under the Act. In the latter event:
Any candidate required to dispose of funds pursuant to this section who has received contributions from the Election Campaign Financing Trust Fund shall return all surplus campaign funds to the Election Campaign Financing Trust Fund.
§ 106.141(4)(b), Fla. Stat. (1993). Failure to timely dispose of surplus funds in accordance with this statute and file the required reports is made a criminal offense. § 106.141(9) and (10), Fla. Stat. (1993). When contributions have been received from the Trust Fund, all surplus funds remaining in the campaign account, whether received from the Trust Fund or private contributors, must be returned to the Trust Fund and cannot be expended for any other purpose, including the campaign for the newly designated office.
On the other hand, when a candidate withdrawing from one race becomes a candidate for a new office, subsection 106.021(1)(a) provides that the candidate can accept no contributions and make no expenditures in the new campaign until the candidate has appointed a campaign treasurer and has designated a primary campaign depository when filing for qualification for the newly designated office. Expenditures can be made only from that fund for purposes of election to the newly designated office. § 106.021(3), Fla. Stat. (1993).
It is significant that the language requiring permission from contributors to a withdrawing candidate to carry over funds to the campaign for a newly designated office was *524 added to section 106.021 by chapter 91-107, Laws of Florida. In that same chapter, the Legislature also amended the campaign financing provisions in section 106.34 to change the expenditure limits for campaigns for Governor and Lieutenant Governor and for cabinet officer. Ch. 91-107, § 21, at 893, Laws of Fla. Yet, the Legislature included no language in chapter 91-107 to require that contributions or expenditures in the first campaign of a withdrawing candidate be imputed to the second campaign. Rather, as previously discussed, the statutes preserve the provisions authorizing a candidate to withdraw from one race and become a candidate for another office in the same election year, while specifically requiring that all contributions and expenditures in each campaign be maintained and accounted for separately, with no funds obtained in one campaign allowed to be expended in support of the other campaign.
The trial court's order, referring to the statutory intent recited in section 106.31, has erroneously concluded that the purpose of the public campaign financing law is to "prevent one candidate from gaining an advantage over another simply on the basis of financial support" and that, "[t]o allow Jim Smith to start fresh at the beginning of a new campaign spending limit when he already has a 2.2 million dollar head start in media exposure would defeat the very purpose of the law." (See text and statute at note 2, p. 10, supra.) The trial court has misread in at least two ways the explicit legislative intent clearly expressed in the language of the Act. In the first place, the legislative intent recited in section 106.31 speaks only in terms of providing public financing of statewide campaigns to encourage persons to run for office who otherwise might not run or might have to depend on contributions from groups representing special interests "to dispel the misperception" of "government officials unduly influenced by those special interests to the detriment of the public interest." The manifest purpose of the Act is, therefore, as we stated in Connor v. Division of Elections, 643 So.2d 75, 77 (Fla. 1st DCA 1994), remedial in scope, and not preventive or prohibitive in nature as characterized by the trial court. The Act is not designed to prevent one candidate from gaining an advantage over another; rather, the explicit language of the statute clearly states that it is to provide financial support for candidates to enable them to fund a campaign for office without undue dependence on special interests.
In the second place, not a single word in the Act identifies "balance" of media exposure as the controlling purpose or legislative intent of the statute, so as to justify the court's fashioning a scheme to create dollar parity between two candidates with respect to media exposure. In subsection 106.011(13), the Act defines "communications media," but that term is used only in section 106.12 dealing with petty cash funds. Having defined "communications media," however, if the purpose of the statute were to equalize or "balance" each candidate's access to such media, most assuredly the Legislature would have adopted specific provisions to that effect by at least some other reference to the term, but it did not do so. Subsection 106.011(4) broadly defines "expenditure" of campaign funds as almost any type of financial transaction "made for the purpose of influencing the results of an election" and manifestly covers many expenses of campaigning other than media expense. The explicit language of the statute refutes rather than supports the trial court's interpretation that equalizing media coverage is a controlling purpose of the Act that justified the remaining rulings in the October 5 order.
In interpreting the Act, the trial court, in seeking legislative intent, relied heavily on comments made by legislators during floor debate. The Florida courts have recognized that "[i]n construing a statute which is susceptible to more than one interpretation, it is often helpful to refer to legislative history," Magaw v. State, 537 So.2d 564, 566 (Fla. 1989) (emphasis added), including reports of staff and committees and transcripts of floor debates. In the present case, however, the plain words of the Act are not susceptible of more than one interpretation, and it is not appropriate to rely upon such extrinsic aids to statutory construction as used by the trial *525 court.[8] Moreover, the comments by the legislators referred in the trial court's order do not even support the conclusion that the trial court reached.
The trial court found, based on evidence presented by Bob Crawford, that Tom Slade, the Chairman of the Republican Party, stated in August 1994 that, at least in Mr. Slade's mind, Mr. Darden was not a bona fide candidate for Commissioner of Agriculture and that he remained a candidate for the office of Commissioner of Agriculture as a place holder for one of the unsuccessful candidates in the September 1994 Republican gubernatorial primary. We conclude that this evidence was wholly irrelevant to the issues in this case. Other than the August statement of Mr. Slade, which reflects only his personal belief, there is no evidence in the record to establish, and counsel for Appellee Crawford acknowledged at oral argument that Mr. Crawford does not contend, that either Mr. Darden or Mr. Smith had knowingly participated in a scheme designed to allow one or more of the Republican candidates for Governor to run for two offices simultaneously by having a Republican candidate, who had no true intention of serving in the cabinet office for which he qualified to run, hold a place for a gubernatorial candidate in a cabinet officer's race until after the initial primary election. See Fair v. Adams, 139 So.2d 879 (Fla. 1962). No charge of such an unlawful scheme was alleged in the complaint against Jim Smith, and there is not one scintilla of evidence that Jim Smith or Frank Darden participated in such a scheme; so the evidence of Tom Slade's conversations and his intent is wholly irrelevant to any issue in this case.
The Democratic Party forcefully argued in its brief and at oral argument that the campaign financing laws contain no provisions that deal with the present situation (with which the trial court agreed), and that the courts should therefore exercise their equitable power to fill in the gap left by the statutory provisions and fashion a fair and equitable remedy. The other rulings in the trial court order were an attempt to do just that; that is, to reform the campaign finance laws to reach a fair and just result in the eyes of the trial court, based on the stated premise that, for purposes of the Act, Jim Smith's two races must, in effect, be treated as one. We have rejected this premise as unsupportable under the explicit language of the relevant statutes and, thus, each of these rulings of the trial court must likewise fall. It is axiomatic that courts may not rewrite legislation or fashion new law that they deem to be "fair" and "just." "[I]t is not the court's duty or prerogative to modify or shade clearly expressed legislative intent in order to uphold a policy favored by the court." Holly v. Auld, 450 So.2d 217, 219 (Fla. 1984).
Accordingly, the ruling that Jim Smith may proceed in the race for Commissioner of Agriculture only as a candidate not participating in the Act, even though Smith voluntarily *526 requested to receive contributions from the Trust Fund in connection with that race, is erroneous. No provision in the Act purports to so penalize a candidate who withdraws from one race and lawfully enters another. The ruling that Jim Smith must repay the Trust Fund an amount equal to the public campaign funds that he received on expenditures in excess of the $2,000,000 spending limit applicable to candidates for a cabinet office is erroneous because these contributions and expenditures were legal when made, and the fact that Smith exercised his lawful right to become a candidate for a newly designated office does not, under any language in the statutes, retroactively make these contributions or expenditures illegal or even relevant to a campaign for the new office. This provision of the order amounts to a penalty or fine not authorized by the language of the applicable statutes. See §§ 106.265, 106.353(2), 106.36, Fla. Stat. (1993).
Similarly, the ruling that Bob Crawford is entitled under section 106.355, Florida Statutes (1993), to immediately obtain public matching funds from the Trust Fund measured by campaign contributions that Jim Smith received in his campaign for Governor is erroneous. Since Jim Smith's campaign for Governor must be accounted for separately from the campaign for Commissioner of Agriculture, Bob Crawford does not presently have a right under section 106.355 to obtain public matching funds by reason of the contributions received or expenditures made by Jim Smith in his campaign for Governor.
Finally, the ruling that Jim Smith must return campaign contributions received in his campaign for Governor from contributors regulated by section 106.082, Florida Statutes (1993), to the extent that those contributions exceed a total of $100 for the entire election year, must be reversed because the record fails to reflect evidence that any of the contributors to Smith's gubernatorial campaign meet those statutory requirements. Absent such evidence, Bob Crawford failed to establish that any substantial case or controversy exists in respect to such contributions. Accordingly, we find it unnecessary to reach any issue regarding the legal status of contributions that may fall within this statutory proscription.

IV.
Even though the plain words of the applicable statute and the Division's interpretation of the statutes require reversal of the trial court's order relating to the campaign finance issues, it is apparent that the statute as currently written by the Legislature has the potential for seemingly unfair results that might invite schemes to manipulate the election laws. These concerns, however, involve inherently political issues that require the rewriting of existing statutes; thus, these concerns are not appropriate for resolution by this court, but are appropriate for consideration and debate by the Florida Legislature.
For the reasons discussed above, the order of September 22, 1994, is affirmed, and the order of October 5, 1994, is reversed. This cause is remanded for further proceedings consistent with this opinion. In view of the order granting acceleration of this case, the time for filing a motion for rehearing is shortened to five working days, and the time for a response thereto is shortened to two working days.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
DAVIS and VAN NORTWICK, JJ., concur.

Appendix A

DISTRICT COURT OF APPEAL, FIRST DISTRICT
 Tallahassee, Florida XXXXX-XXXX
 Telephone (904) 488-6151
 DATE: October 13, 1994
 CASE NO.: 94-3240
 Jim Smith, in his individual
 capacity, Appellant.
 vs.
 Bob Crawford, Appellee.
*527 BY ORDER OF THE COURT:
Having fully considered the orders entered in this cause by the Circuit Court in and for Leon County on September 22, 1994, and October 5, 1994, the briefs of the parties, the stipulated appendices (including the advisory letter dated September 16, 1994, from Dorothy W. Joyce, Director of the Division of Elections to Tom Slade, Chairman of the Republican Party of Florida, which letter was issued pursuant to section 106.23(2), Florida Statutes), and oral argument of counsel, the issues raised by this appeal and cross-appeal are resolved as follows:
1. The circuit court had jurisdiction to entertain the issues raised in the Complaint for Injunctive and Declaratory Relief filed September 19, 1994, and the Supplement to Complaint filed September 23, 1994; and this court has jurisdiction to review the referenced orders pursuant to article V, section 4(b)(1) of the Florida Constitution and rule 9.030(b)(1)(A), Florida Rules of Appellate Procedure.
2. The Partial Final Order Declaring Rights on the Issue of Qualification for Office, entered by the circuit court on September 22, 1994, declaring that Jim Smith's candidacy for Commissioner of Agriculture is not barred by any provision of the Florida Election Code, is affirmed.
3. The Partial Final Order Declaring Rights Relating to Campaign Contributions and Campaign Financing entered by the circuit court on October 5, 1994, is reversed in the following respects:
a. The ruling that Jim Smith is not qualified to receive public campaign financing in his present campaign for Commissioner of Agriculture is erroneous. Although Mr. Smith has received public campaign financing in his race for Governor of Florida and Mr. Smith's campaign expenditures in his race for Governor exceeded the $2,000,000 limitation applicable to a candidate for Commissioner of Agriculture set forth in section 106.34(1)(b), Florida Statutes (1993), these contributions and expenditures do not render Smith ineligible for public financing of his campaign for Commissioner of Agriculture.
b. The ruling that Jim Smith may proceed in the race for Commissioner of Agriculture as a candidate who is not participating in the Florida Election Campaign Financing Act is erroneous in view of Mr. Smith's voluntary request to receive contributions from the Election Campaign Financing Trust Fund in connection with his campaign for the office of Commissioner of Agriculture.
c. The ruling that Jim Smith must repay the Election Campaign Financing Trust Fund an amount equal to the public campaign funds that he received on expenditures in excess of the $2,000,000 spending limit applicable to candidates for a cabinet office is erroneous because it amounts to a penalty not authorized by the language of the applicable statutes.
d. The ruling that Bob Crawford is entitled under section 106.355, Florida Statutes (1993), to immediately obtain public matching funds from the Election Campaign Financing Trust Fund as a result of campaign contributions that Mr. Smith received in his campaign for governor is erroneous. Mr. Crawford does not have a right to obtain public matching funds by reason of any contributions received or expenditures made by Jim Smith in his campaign for governor.
e. The ruling that Jim Smith must return campaign contributions received in his campaign for governor from any contributors regulated by section 106.082, Florida Statutes (1993), to the extent that those contributions exceed a total of $100.00 for the entire election year, is erroneous because the record fails to reflect evidence of any substantial case or controversy involving such contributions to Mr. Smith.
4. The Division of Elections is statutorily charged with the administration of the provisions of chapter 106, Florida Statutes, governing campaign financing, which includes the power to issue advisory opinions construing the provisions of this chapter. § 106.22-.23, Fla. Stat. (1993). In response to an inquiry by a proper party, the Division issued the advisory opinion cited above on the issues decided by the circuit court in the orders under review. The circuit court erred in rejecting the Division's construction of the statute in the advisory opinion on grounds *528 that the Division falls within the Department of State currently headed by Mr. Smith as Secretary of State, because the record fails to show that Mr. Smith participated in any way in the preparation of that opinion. This court's resolution of these issues is consistent with the Division's construction of the statutory provisions in the advisory opinion. A court is required to give deference and great weight to an agency's construction of the statutes it is charged with administering and is not authorized to overturn the agency's determination unless it is "contrary to the language of the statute," Greyhound Lines, Inc. v. Yarborough, 275 So.2d 1, 3 (Fla. 1973), or "clearly erroneous," Department of Professional Regulation v. Durrani, 455 So.2d 515, 517 (Fla. 1st DCA 1984). The record in this case, although revealing a result that may appear to be patently unfair to Mr. Crawford in his candidacy for Commissioner of Agriculture, fails to establish that the Division's construction of the statutory provisions is clearly erroneous or contrary to the language of the statute.
A full opinion will be issued shortly.
I HEREBY CERTIFY that the foregoing is a true copy of the original court order.
 /s/ Jon S. Wheeler
 JON S. WHEELER, CLERK
 By: /s/ Laurie Black
 Deputy Clerk
copies:
 Barry Richard
 Robert A. Butterworth
 Richard C. McFarlain
 Richard Tritschler
 Dave Lang
 Karen A. Gievers
 Phyllis Slater
 John A. French, Jr.
 Mike Cochran
 Philip Padovano
NOTES
[1] The Republican Party of Florida and Jim Smith, as Secretary of State, are nonetheless required to be designated as appellees by rule 9.020(f)(2), Florida Rules of Appellate Procedure.
[2] Section 106.31 provides:

Legislative Intent.  The Legislature finds that the costs of running an effective campaign for statewide office have reached a level which tends to discourage persons from becoming candidates and to limit the persons who run for such office to those who are independently wealthy, who are supported by political committees representing special interests which are able to generate substantial campaign contributions, or who must appeal to special interest groups for campaign contributions. The Legislature further finds that campaign contributions generated by such political committees are having a disproportionate impact vis-a-vis contributions from unaffiliated individuals, which leads to the misperception of government officials unduly influenced by those special interests to the detriment of the public interest. The Legislature intends ss. 106.30-106.36 to alleviate these factors, dispel the misperception, and encourage qualified persons to seek statewide elective office who would not, or could not, otherwise do so.
[3] Rather than being required to strictly construe this Act, this court has recognized that the Act is a "remedial statute ... [that] should be liberally construed... ." Connor v. Division of Elections, 643 So.2d 75, 77 (Fla. 1st DCA 1994).
[4] As stated in the trial court's October 5 order, section 106.082 "provides that an entity doing business as a food outlet or a convenience store [regulated by chapter 500] may not give more than $100.00 to a candidate running for Commissioner of Agriculture." By comparison, subsection 106.08(1)(a)3 sets a general $500 limit on contributions to candidates for Governor and other statewide offices.
[5] The Division's opinion DE 94-17 is consistent with its prior opinion DE 78-38.
[6] At the September 30 hearing below, Jim Smith testified as follows:

Q... . [W]ere you actively participating in supervising the preparation of advisory opinion letters from the Division of Elections during the week of the 12th of September?
A. No.
[7] Even assuming an agency head is disqualified by reason of conflict of interest from participating in the performance of an agency function, the agency itself would not be so disqualified, and the agency's interpretation would be entitled to judicial deference.
[8] It appears as though the trial court's misreading of the Act grew out of its misplaced reliance on comments made during legislative floor debate. This result shows the inherent difficulties in using such evidence to illuminate legislative intent. Commentators have frequently discussed the unreliability of statements made during floor debate:

Courts have generally refused to consider statements made during floor debate as evidence of legislative intent. Various reasons have been advanced for this rule. Some legislators may not have been present during floor debate. Often what is said in debate is for the benefit of constituents only and may be regarded by courts as self serving. Furthermore, supporters of a controversial measure may fear that too much explanation and discussion will cause its defeat, and thus they attempt to minimize debate.
Robert M. Rhodes, John Wesley White & Robert S. Goldman, The Search for Intent: Aids to Statutory Construction in Florida, 6 Fla.St.U.L.Rev. 383, 396-397 (1978). (Footnote omitted.) As Federal Circuit Judge Kenneth Starr stated "[l]egislative history... has the potential to mute (or indeed override) the voice of the statute itself," Kenneth W. Starr, Observations on the Use of Legislative History, 1987 Duke L.J. 371, 375, and even encourage courts to engage in "high fiction in interpreting statutes." Id. at 378. In fact, as Federal Circuit Judge Patricia Wald has observed, it "sometimes seems that citing legislative history is still ... akin to `looking over a crowd and picking out your friends.'" Patricia M. Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L.Rev. 195, 214 (1983).