885 So.2d 303 (2004)
The REFORM PARTY OF FLORIDA, et al., Appellants,
v.
Harriet Jane BLACK, et al., Appellees.
Glenda Hood, etc., Appellant,
v.
Harriet Jane Black, et al., Appellees.
Nos. SC04-1755, SC04-1806.
Supreme Court of Florida.
September 17, 2004.
Kenneth W. Sukhia of Fowler, White, Gillen, et al., Tallahassee, FL, on behalf of Ralph Nader and Peter Camejo; George N. Meros, Jr. and Jonathan Paul Kilman of Gray Robinson, P.A., Tallahassee, FL, George L. Waas and Gerald B. Curington, Assistant Attorneys General, Tallahassee, FL, and Richard Antonio Perez, General Counsel, Department of State, Tallahassee, FL, on behalf of Honorable Glenda Hood; and D. Andrew Byrne, Jackson Maynard, *304 Jr., and Darren A. Schwartz of Cooper, Byrne, Blue & Schwartz, Tallahassee, FL, on behalf of the Reform Party of Florida and the Reform Party of the United States of America, for Appellants.
Edward S. Stafman, Tallahassee, FL, Kelly Overstreet Johnson, David K. Miller, M. Stephen Turner and Brooke E. Lewis of Broad and Cassel, Tallahassee, FL, on behalf of Harriett Jane Black, Robert Rackleff, William Chapman, and Terry Anderson; Laurence H. Tribe, Cambridge, Massachusetts, Stephen Frederick Rosenthal, Michael Scott Olin, and Maria Kayanan of Podhurst Orseck, P.A., Miami, Florida, Mark Herron and Thomas M. Findley of Messer, Caparello & Self, P.A., Tallahassee, FL, and Richard B. Rosenthal and Joel Stephen Perwin of Joel Perwin, P.A., Miami, FL, on behalf of Candice Wilson, Alan Herman, Scott Charles Maddox, and the Florida Democratic Party, for Appellees.
PER CURIAM.
We have for review a trial court judgment certified by the First District Court of Appeal to be of great public importance and to require immediate resolution by this Court. We have jurisdiction. See art. V, § 3(b)(5), Fla. Const. For the reasons explained below, we reverse the trial court's final declaratory judgment and vacate the permanent injunction that ordered Reform Party candidates Ralph Nader and Peter Camejo off the 2004 Florida presidential ballot. In making our decision in this case we are guided by the overriding constitutional principles in favor of ballot access and our recognition of the plenary authority of the Legislature to direct the manner of selecting Florida's presidential electors.

Procedural History
Despite the short time frame since the genesis of this case, it has a convoluted procedural history. On August 31, 2004, the Reform Party State Executive Committee submitted papers to Florida Secretary of State Glenda Hood seeking to qualify Ralph Nader and Peter Camejo as presidential and vice-presidential candidates for the Reform Party of the United States of America (Reform Party USA) on the Florida ballot for the general election scheduled for November 2, 2004, pursuant to section 103.021(4)(a), Florida Statutes (2003). Governor Jeb Bush certified the Reform Party slate of presidential electors to Secretary of State Glenda Hood, who in turn certified that the names of Nader and Camejo be placed on the 2004 Florida presidential ballot. On September 2, 2004, two separate complaints were filed in the Circuit Court for the Second Judicial Circuit, seeking a reversal of the certification and removal of Nader and Camejo's names from the ballot. One group of plaintiffs included Candice Wilson and Alan Herman, both registered members of the Reform Party, Scott Maddox, a registered member of the Democratic Party and the Chairman of the Florida Democratic Party, and the Florida Democratic Party. The second group of plaintiffs included Harriet Jane Black, a registered Republican from Pinellas County, Robert Rackleff, a registered Democrat from Leon County, William Chapman, a registered member of the Reform Party from Marion County, and Terry Anderson, a registered Independent from Miami-Dade County. Both complaints named Secretary of State Hood, the Reform Party of Florida, Ralph Nader, and Peter Camejo as defendants.[1] *305 The complaints alleged that Nader and Camejo are not "minor party" candidates affiliated with a national party as provided in section 103.021(4)(a), but rather are independent candidates who use the name "Reform Party of Florida" to claim affiliation with the national Reform Party where no affiliation actually exists. The plaintiffs also filed an emergency motion for injunctive relief and a memorandum of law in support of a preliminary injunction.
A status conference on the complaints was scheduled for September 7, 2004, but had to be postponed because of Hurricane Frances. When the plaintiffs received information that the Secretary of State intended to certify the Reform Party presidential slate for inclusion on the presidential ballot on Wednesday, September 8, they rescheduled the conference to include a hearing on their motion for a preliminary injunction. The new hearing, which was held on the afternoon of September 8, became a seven-hour preliminary injunction hearing.
At this hearing, the circuit court received documentary and testimonial evidence and heard argument from the parties. After the hearing, the judge issued an order preliminarily enjoining the Secretary of State from certifying Nader and Camejo as candidates for the Florida 2004 presidential ballot and from certifying the electors offered by the Reform Party of Florida. The court concluded that preliminary injunctive relief was appropriate as the plaintiffs had satisfied the four-part test under Florida law: a substantial likelihood of success on the merits; lack of an adequate remedy at law; irreparable harm absent the entry of an injunction; and that injunctive relief will serve the public interest.[2]
The circuit court found that the plaintiffs had demonstrated a likelihood of success on the merits, finding a "substantial likelihood" that the Reform Party failed to comply with the requirements of section 103.021(4)(a). The circuit court based its conclusion on a number of findings, including that the Reform Party USA is not a "national party," candidates Nader and Camejo were not nominated in a "national convention," and the Reform Party of Florida is not affiliated with the Reform Party USA. The circuit court cited an advisory opinion issued by the Federal Election Commission as providing guidance in its determination that the Reform Party USA is not a national party. The court considered the fact that the Reform Party USA does not broadly offer or support candidates for national office, apart from its presidential and vice-presidential nominees. The circuit court noted that, rather than being nominated in a "national convention," Nader and Camejo were endorsed by the party via a conference telephone call. Further, the conference call did not follow the Reform Party USA's own definition of a "national convention." Finally, the court found that the Reform Party of Florida does not appear to be a minor party affiliated with a national party as required by the statute. The court noted that an April 2002 letter from the Chairman of the Reform Party of Florida shows that the Florida sector disaffiliated from the national party. Based on these findings, the circuit court concluded that the Reform Party of Florida would be unlikely to meet the requirements of the statute.
*306 As to the other grounds for ordering injunctive relief, the court found that there is no adequate remedy at law because neither party's damages can be reduced to a monetary amount and the potential public harm in failing to follow the applicable legal requirements cannot be dissipated by ordinary judicial remedies. The court further found that the plaintiffs will suffer irreparable harm without the injunction. Orange County Supervisor of Elections Bill Cowles testified that the inclusion of an erroneous candidate for president on the ballot would be disastrous. Finally, the court found that the injunctive relief would serve the public interest because Florida has important interests in enforcing its election laws, ensuring that only qualified candidates appear on its ballot, protecting the integrity of the ballot and election process, and preventing voter confusion during the election.
Thus, the circuit court preliminarily enjoined Secretary Hood from certifying Ralph Nader and Peter Camejo as candidates on the 2004 Florida presidential election ballot and from certifying the electors offered by the Reform Party of Florida. As the court pointed out in its order, "time is of the essence in this dispute" in that county election supervisors are required by law to mail certain absentee ballots no later than Saturday, September 18, 2004, forty-five days prior to election day. See § 101.62(4)(a), Fla. Stat. (2003) (providing that the supervisor of elections shall mail an "advance absentee ballot" to overseas voters requesting an absentee ballot "[n]ot fewer than 45 days before the ... general election").
The Reform Party of Florida, Nader, and Camejo appealed the non-final preliminary injunction to the First District Court of Appeal. They also sought a stay pending review. The district court did not rule on the stay and concluded that the case required immediate resolution by this Court, pursuant to Florida Rule of Appellate Procedure 9.125. See Reform Party of Fla. v. Black, No. 1D04-4050 (Fla. 1st DCA Sept. 13, 2004). In the meantime, Secretary Hood filed a notice of appeal on September 13, thereby invoking the automatic stay provision for public bodies and public officers under Florida Rule of Appellate Procedure 9.310(b)(2).[3] This automatically stayed the circuit court's temporary injunction prohibiting the Secretary of State from certifying the names of Nader and Camejo for inclusion on the 2004 Florida presidential ballot. Simultaneously, Secretary Hood directed the supervisors of elections to include the names of Nader and Camejo on the ballot. The plaintiffs filed a motion asking the circuit court to vacate the automatic stay; they filed a similar motion in this Court.
This Court agreed to accept jurisdiction of the case, while permitting the litigation to continue in the circuit court. See Reform Party of Fla. v. Black, No. SC04-1755 *307 (Fla. Sept. 13, 2004) (order accepting jurisdiction and setting briefing). This Court ordered the circuit court to proceed with its final hearing and the entry of a final order and to determine any motions relating to the automatic stay.
After receiving this Court's order on September 13, the plaintiffs contacted the trial judge, who was out of the state, and requested that he rule on their motion to vacate the automatic stay. While the judge was considering the motion, Defendants Nader, Camejo, and the Reform Party of Florida filed a petition on September 13 in the United States District Court for the Northern District of Florida to remove the case to federal court, based on a federal question. The plaintiffs responded by filing an emergency motion for remand to state court. On September 14, 2004, the United States District Court remanded the case to the state court. The federal court cited three bases for remanding the case to state court: all of the counts raised in the plaintiffs' complaint are grounded solidly in state law and thus do not raise a valid federal question sufficient to invoke the district court's jurisdiction; the defendants had not met the unanimity requirement as Secretary Hood had not consented to the removal and she is a necessary and indispensable party to the case; and the defendants waived their rights to remove the cause to federal court by invoking the jurisdiction of the Florida appellate courts and by participating in evidentiary hearings on the merits of the case.
The circuit court judge scheduled a hearing for 8:00 a.m. on Wednesday, September 15 to consider the plaintiffs' motion to vacate the automatic stay and their motion to modify the preliminary injunction. By early Wednesday afternoon, the circuit court issued orders vacating the automatic stay and modifying the preliminary injunction. The modified injunction ordered the Secretary of State to instruct all county supervisors of elections to mail corrected ballot forms not containing Nader and Camejo as candidates in the presidential election to all recipients who had previously been mailed ballot forms containing these names. The Secretary of State was further ordered to instruct the supervisors of elections that any corrective mailings must include clear written notice that the previous ballots did not comply with Florida law and that the corrected ballot form is the valid form. The court also ordered the plaintiffs to post a $10,000 bond to cover additional expenses that may be incurred by the supervisors of elections should this Court rule that the ballots must contain the names of Nader and Camejo.
The Secretary of State immediately filed a motion asking this Court to reinstate the automatic stay, arguing that the preservation of integrity in the election system required the circuit court's preliminary injunction to be stayed. In order to preserve the rights of the parties and the voters in anticipation of the impending disposition of this case, we granted the motion to reinstate the stay in part. However, pursuant to rule 9.310(b)(2), this Court imposed a condition that the Secretary of State instruct the county supervisors of elections to desist from mailing ballots to voters pending further order of this Court. This Court also scheduled oral argument in the case for Friday, September 17, 2004, at 8:00 a.m.
In the meantime, the circuit judge proceeded with the final hearing on the plaintiffs' complaints requesting permanent injunctive relief. During this thirteen hour evidentiary hearing, the judge heard testimonial evidence from witnesses, admitted documentary evidence, and heard argument from both sides. At the conclusion *308 of this evidentiary hearing, the court issued a final declaratory judgment finding that Nader and Camejo are not legally qualified under Florida law to appear on the Florida ballot as candidates for president and vice-president. The court also permanently enjoined the Secretary of State from certifying Nader and Camejo on Florida's ballots, from instructing the county surpervisors of elections to include their names on the ballot, and from mailing any ballots pending further order of this Court.
Based on the district court's certification of this case, we review the circuit court's declaratory judgment and order of permanent injunction. This case involves the constitutional right of individuals to associate for the advancement of political beliefs and the constitutional right of qualified voters to cast their votes effectively. See, e.g., Munro v. Socialist Workers Party, 479 U.S. 189, 193, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986); Anderson v. Celebrezze, 460 U.S. 780, 787, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); Storer v. Brown, 415 U.S. 724, 729, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). The State, however, has a "substantial state interest in encouraging compromise and political stability, in attempting to ensure that the election winner will represent a majority of the community and in providing the electorate with an understandable ballot." Storer v. Brown, 415 U.S. at 729, 94 S.Ct. 1274, 39 L.Ed.2d 714 (citing Williams v. Rhodes, 393 U.S. 23, 32, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)). "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Storer, 415 U.S. at 730, 94 S.Ct. 1274. Thus, the United States Supreme Court has
upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself. The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates.
Anderson, 460 U.S. at 788 n. 9, 103 S.Ct. 1564.
Under Article II, Section 1, Clause 2 of the United States Constitution, the state legislatures are given the authority to regulate who is placed on the ballot. See Storer, 415 U.S. at 730, 94 S.Ct. 1274. This constitutional provision reads:
"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress...."
In Bush v. Palm Beach County Canvassing Board, 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000), the U.S. Supreme Court held that with respect to a presidential election, this provision constitutes a "direct grant of authority" to state legislatures.
As early as 1949, Florida's Legislature provided a method by which minor party candidates could access the ballot. See ch. 25143, Laws of Florida (1949) (allowing a candidate of a minor political party to appear on the ballot by gathering 7500 signatures with at least 25 signatures from each of 34 counties and no more than 1000 from 25 counties). In 1967 the Legislature amended the law to allow ballot access by gathering signatures from a required percentage of registered voters. See ch. 67-353, § 1, at 1127-28, Laws of Fla. In 1970 the Legislature added the requirement that a minor political party be affiliated *309 with a national party holding a national convention to nominate presidential and vice-presidential candidates. See ch. 70-269, § 7, at 851-52, Laws of Fla. Thus, a minor party candidate was required to both gather signatures and affiliate with a national party holding a national convention in order to appear on the presidential ballot in Florida. Significant to this case is the change made to the law in 1999, when the Legislature uncoupled the requirements of gathering signatures and affiliating with a national party. See ch. 99-318, § 4, at 3400, Laws of Fla.[4]
This legislative history illustrates how the Florida Legislature has chosen to balance the competing interests involved in ballot access. Presidential and vice-presidential candidates who are nominated through the primary election process are entitled to have their names printed on the Florida general election ballot based on this primary election process. See § 101.2512(1), Fla. Stat. (2003); see also § 103.101, Fla. Stat. (2003) (outlining procedure for presidential preference primary). Minor party and independent candidates for president and vice-president who have not been nominated through the primary process may have their names printed on the general election ballot by complying with the statutory procedures established by the Florida Legislature. See § 103.021(3), (4), Fla. Stat. At issue in this case is the statute governing minor party candidates' access to the ballot, which provides:
(a) A minor party that is affiliated with a national party holding a national convention to nominate candidates for President and Vice President of the United States may have the names of its candidates for President and Vice President of the United States printed on the general election ballot by filing with the Department of State a certificate naming the candidates for President and Vice President and listing the required number of persons to serve as electors. Notification to the Department of State under this subsection shall be made by September 1 of the year in which the election is held. When the Department of State has been so notified, it shall order the names of the candidates nominated by the minor party to be included on the ballot and shall permit the required number of persons to be certified as electors in the same manner as other party candidates.
§ 103.021(4)(a), Fla. Stat. (2003).[5]
Pursuant to this statute, the Reform Party of Florida presented documents to *310 the Secretary of State in order to have its candidates' names placed on the 2004 Florida presidential ballot. Thereafter, the plaintiffs filed two separate complaints seeking a determination of whether the Reform Party of Florida candidates should appear on the ballot and asking for an injunction. The plaintiffs alleged that the Reform Party of Florida does not meet the statutory requirements of being a "minor party that is affiliated with a national party holding a national convention to nominate candidates for President and Vice President of the United States." After a lengthy evidentiary hearing, that included receipt of documentary evidence and arguments from the parties, the trial judge issued a declaratory judgment that the Reform Party of Florida candidates are not legally qualified under Florida law to appear on the ballot because the Reform Party USA is not a national party. The trial judge also issued a permanent injunction prohibiting the Secretary of State from certifying the Reform Party of Florida candidates on Florida ballots and from instructing the county supervisors of elections from including these candidates on the ballots. This review follows.

Analysis
An order in a declaratory judgment action is generally accorded a presumption of correctness on appellate review. See, e.g., Williams v. Gen. Ins. Co., 468 So.2d 1033, 1034 (Fla. 3d DCA 1985). However, to the extent that the decision rests on a question of law, the order is subject to full, or de novo, review on appeal. See Smith v. Coalition to Reduce Class Size & Pre-K Comm., 827 So.2d 959, 961 (Fla.2002); Sancho v. Smith, 830 So.2d 856, 861 (Fla. 1st DCA 2002).
As previously explained, the issue in this case is not whether the State may impose "some burden" upon the access to the ballot. The State may clearly do so. Burdick v. Takushi, 504 U.S. 428, 430, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (concluding that Hawaii's prohibition of write-in votes did not "impermissibly burden the right to vote"). However, the rule of Williams v. Rhodes, 393 U.S. 23, 28-29, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), frames the extent of the "burden" that may be imposed:
The State also contends that it has absolute power to put any burdens it pleases on the selection of electors because of the First Section of the Second Article of the Constitution, providing that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors ..." to choose a President and Vice President. There, of course, can be no question but that this section does grant extensive power to the States to pass laws regulating the selection of electors. But the Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be *311 exercised in a way that violates other specific provisions of the Constitution.
Thus, our analysis of the specific burdens must be viewed in light of access to the ballot being constitutionally based.
The issue before us is whether the Reform Party of Florida and its presidential nominees Ralph Nader and Peter Camejo qualify for the ballot under section 103.021(4)(a). According to the statute, there must be a "certificate naming the candidates for president and vice president and listing the required number of persons to serve as electors." § 103.021(4)(a), Fla. Stat (2003). The Secretary of State asserts that her function is purely ministerial and that therefore she has no basis to look behind the certificate to determine that the party meets the statutory criteria.
The method for ballot qualification set out in section 103.021(4)(b) for a minor party not affiliated with a national party holding a national convention requires that a specific percentage of registered voters must petition to place the candidate on the ballot. This involves a pure question of objectively verifiable fact. However, the determination of whether the candidate qualifies under section 103.021(4)(a) by claiming to be a "minor political party that is affiliated with a national party holding a national convention to nominate candidates for President and Vice President" involves a legal determination.
We are especially mindful of the fact that this statute must be construed consistent with the important constitutional rights that are involved: "[T]he right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams v. Rhodes, 393 U.S. at 30, 89 S.Ct. 5, 21 L.Ed.2d 24. As the United States Supreme Court explained in Williams:
Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States. Similarly, we have said with reference to the right to vote: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."
... The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for the one of two parties at a time when other parties are clamoring for a place on the ballot.
Id. at 30-31, 89 S.Ct. 5 (footnotes omitted) (quoting Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)). It follows that when the state imposes a burden upon access to the ballot, that burden must be clearly delineated. Thus, any doubt as to the meaning of statutory terms should be resolved broadly in favor of ballot access. As this Court recognized in the context of a challenge to a candidate's eligibility to run for governor under the Florida Constitution:
Even if there were doubts or ambiguities as to his eligibility, they should be resolved in favor of a free expression of the people in relation to the challenged provision of the Constitution. It is the sovereign right of the people to select their own officers and the rule is against *312 imposing disqualifications to run. The lexicon of democracy condemns all attempts to restrict one's right to run for office. The Supreme Court of the United States has approved the support of fundamental questions of law with sound democratic precepts. Florida is committed to the general rule in this country that the right to hold office is a valuable one and should not be abridged except for unusual reason or by plain provision of law.
Ervin v. Collins, 85 So.2d 852, 858 (Fla.1956); see also Smith v. Crawford, 645 So.2d 513, 520 (Fla. 1st DCA 1994) (stating that "the law requires judges to resolve doubts about qualification of a political candidate in favor of the candidate").
In construing the statute we are also mindful that the Legislature has exclusive power to define the method of determining how the electors of the state are chosen under Article II, Section 1, Clause 2 of the United States Constitution. See Bush v. Palm Beach County Canvassing Bd., 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000). In other words, although the judiciary has the power and authority to construe statutes, it cannot construe statutes in a manner that would infringe on the direct grant of authority to the Legislature through the United States Constitution. Nevertheless, because the Legislature used terms such as "national party" and "national convention," we must assume that the Legislature intended these terms to have some meaning, especially because this method of ballot access is far less onerous than the method in section 103.021(4)(b), which requires obtaining signatures from one percent of registered voters in Florida. Thus, our ultimate question is how we should interpret these terms. We first focus on the term "national party."
The term "national party" is not defined in section 103.021(4)(a) or in any other Florida legal authority. Where there is uncertainty in the meaning to be given the words employed in a statute, "the Court must resort to canons of statutory construction in order to derive the proper meaning." Seagrave v. State, 802 So.2d 281, 286 (Fla.2001). Further, this Court explained that
[o]ne of the most fundamental tenets of statutory construction requires that we give statutory language its plain and ordinary meaning, unless words are defined in the statute or by the clear intent of the legislature. When necessary, the plain and ordinary meaning of words can be ascertained by reference to a dictionary.
Nehme v. Smithkline Beecham Clinical Labs., Inc., 863 So.2d 201, 204-05 (Fla.2003) (citations and quotation marks omitted). There is no definition of "national party" in the dictionary. The dictionary definitions of "national" and "party" provide little guidance. See Merriam Webster's Collegiate Dictionary 773, 848 (10th ed.1998) (defining national as "of or relating to a nation"; defining party as "a group of persons organized for the purpose of directing the policies of a government"); Black's Law Dictionary 1144-45 (7th ed.1999) (defining "party" in the context of a legal proceeding).
In the absence of a statutory or dictionary definition, courts have relied on textbooks and legal authority from other jurisdictions. See Smith v. State, 80 Fla. 315, 85 So. 911 (1920) (relying on textbook definitions and courts of other jurisdictions to determine the meaning of a statutory phrase); 48A Fla. Jur.2d Statutes § 132 (2000). To that end, we look to how other states have defined a "national party" and *313 how the federal government interprets this term.
Hawaii defines a national party as
a party established and admitted to the ballot in at least one state other than Hawaii or one which is determined by the chief election officer to be making a bona fide effort to become a national party.
Haw.Rev.Stat. § 11-113(b) (1993) (emphasis added). In contrast, in order to be considered a "national political party" in Iowa, the party must
meet[ ] the definition of a political party established for this state by section 43.2, and ... meet[ ] the statutory definition of the term "political party" or a term of like import in at least twenty-five other states of the United States.
Iowa Code § 68A.102(16) (2003) (emphasis added). Puerto Rico defines a national party as
every political party that nominates and participates in the election of candidates for the offices of President and Vice-President of the United States of America.
16 P.R. Laws Ann. § 1322 (1987). Thus, there is no consensus on what constitutes a national party, even among the few states that define the term.
The Federal Election Commission (FEC) seems to have created a working definition of a "national party" in light of the elements it considers in granting national committee status to a minor political party. We glean these elements from the advisory opinions issued by the FEC. Of particular interest is FEC Advisory Opinion 1998-2, which sets forth the criteria it used to determine whether the "political party or its committees have demonstrated sufficient activity on a national level to attain national committee status." Fed. Elect. Comm. Ad. Op.1998-2. The main three factors the FEC looks to in determining whether "national committee" status exist are:
(1) the party's nomination of candidates for various Federal offices in numerous states;
(2) the party's engagement in certain activities on an ongoing basis (rather than with respect to a particular election) such as supporting voter registration and get-out-the-vote drives;
(3) the party's publicization of issues of importance to the party and its adherents throughout the nation.
Id.; see also Fed. Elect. Comm. Ad. Op.1996-35.
There is no dispute that under the FEC's definition the Reform Party USA qualified as a national party up through the 2000 election. The dispute is whether the Reform Party USA subsequently lost its status as a national party because it no longer has significant support, has almost eliminated fundraising, and has candidates on the ballot for federal office other than president in only two other states.
Although the appellees have presented facts to support an argument that the Reform Party USA no longer meets the criteria set forth by the FEC, we cannot conclude that the Legislature intended to incorporate the FEC definition within the use of the term "national party." This is especially so because the FEC's interest relates to the integrity of campaign fundraising access, whereas the state's interest lies in protecting the integrity of the ballot. If we were to construe the term more narrowly than the Legislature intended, we could run afoul of Article II, Section 1, Clause 2 of the United States Constitution. This we decline to do.
Among other testimony in the record, the Reform Party presented evidence that in 1998 the FEC found it to be a *314 national committee. Even today the Reform Party USA has affiliates remaining in several states and has placed candidates on the ballot for federal office in at least two states. While there were disputes as to whether the national convention held violated Reform Party USA's own constitution, the evidence showed that some type of meeting occurred. Additionally, while the evidence of whether the Reform Party remained affiliated with the national party was disputed, the trial court recognized that some type of affiliation continued.
The Reform Party of Florida filed its certificate for placement on the 2004 Florida presidential ballot with the Secretary of State pursuant to section 103.021(4)(a). This statute did not outline standards or definitions for the most critical terms, namely: "national party" and "national convention." Thus, the Reform Party of Florida was not on notice that these terms were to be interpreted in accordance with any specific criteria and certainly not the criteria utilized by the trial court. After a thorough review of the statute, related Florida statutes, the legislative history, statutes in other states, and federal statutes and standards, we have been unable to ascertain whether the Legislature intended for the statutory terms to have a strict or broad meaning. In the absence of more specific statutory criteria or guidance from the Legislature we are unable to conclude that a statutory violation occurred.
We therefore reverse the trial judge's declaratory judgment and vacate the permanent injunction because section 103.021(4)(a) is not sufficiently clear to put the Reform Party of Florida on notice that it could not qualify under its provisions. However, we are left with a statute that does not have its critical terms defined or standards set for ascertaining compliance with the statute. We thus urge the Legislature to revisit this important issue at its earliest opportunity.
It is so ordered.
PARIENTE, C.J., and WELLS, QUINCE, CANTERO and BELL, JJ., concur.
LEWIS, J., concurs in result only with an opinion.
ANSTEAD, J., dissents with an opinion.
LEWIS, J., concurring in result only.
I cannot at all agree with the analysis and reasoning of the majority. The right to vote is a fundamental and essential part of our constitutional democracy and is subject to reasonable regulation. The United States Supreme Court made this apparent in Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), when it stated:
It is beyond cavil that voting is of the most fundamental significance under our constitutional structure. It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute. The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.
Id. at 433, 112 S.Ct. 2059 (citations and quotation marks omitted).
*315 Although minor political parties most certainly do have a right to be on the ballot, courts have consistently held that this right is not absolute and without restrictions:
[T]he state has an interest in regulating the election process and avoiding voter confusion. That these, and the other interests asserted, are compelling has been well established under decided cases. Lubin v. Panish, 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974); American Party of Texas v. White, 415 U.S. 767, 782 n. 14, 94 S.Ct. 1296, 1307 n. 14, 39 L.Ed.2d 744 (1974); Bullock v. Carter, 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972). The Supreme Court stated in Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), that a state has an important interest "in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot  the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." Id. at 442, 91 S.Ct. at 1976.
Libertarian Party of Fla. v. Florida, 710 F.2d 790, 792-93 (11th Cir.1983). The states' compelling interests include maintaining fairness, honesty, and order, see Burdick, 504 U.S. at 433, 112 S.Ct. 2059, minimizing frivolous candidacies, see Lubin, 415 U.S. at 715, 94 S.Ct. 1315, and "avoiding confusion, deception, and even frustration of the democratic process," Jenness, 403 U.S. at 442, 91 S.Ct. 1970. The United States Supreme Court has recognized that
[a] procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process.
Lubin, 415 U.S. at 715, 94 S.Ct. 1315.
Florida's statutory scheme has properly enacted safeguards to protect our electoral process. Section 103.021 of the Florida Statutes (2003) requires that persons who seek to be a candidate for President on Florida's ballot must show substantial support, either by a valid signature provision, see § 103.021(4)(b), Fla. Stat. (2003), or by demonstrating that he or she was nominated at a national nominating convention of a minor party that is affiliated with a national party, see § 103.021(4)(a), Fla. Stat. (2003). The Legislature has enacted this statutory scheme to further the State's compelling interest in maintaining fairness, honesty, and order, along with minimizing frivolous candidacies to avoid confusion, deception, and frustration of the democratic process. Our system is legislatively designed so that minor parties affiliated with a national party holding a national convention, see § 103.021(4)(a), Fla. Stat. (2003), are treated differently than minor parties that are not affiliated with a national party holding a national convention, see § 103.021(4)(b), Fla. Stat. (2003). To construe subsection (4)(a) as the majority does today is nothing less than this Court basically rewriting the statute and using a judicial eraser to strip section (4)(a) of the same dignity as this Court has afforded the petition requirement in subsection (4)(b).
The present dispute has called into question the utilization of this statute by a party in connection with the current ballot. There is no administrative remedy afforded under these circumstances and, therefore, it necessarily falls on the shoulders of the judiciary to determine the rights of the parties in this dispute by interpreting and *316 applying the statute. Most assuredly, the Legislature had the power to draft this statute using any language desired and it chose to include only the word "national" to qualify what specific party would be subject to subsection (4)(a).
Section 103.021(4)(a) of the Florida Statutes utilizes the term "national" with regard to the description of the entity and with regard to its operation in two locations:
(4)(a) A minor party that is affiliated with a national party holding a national convention to nominate candidates for President and Vice President of the United States may have the names of its candidates for President and Vice President of the United States printed on the general election ballot by filing with the Department of State a certificate naming the candidates for President and Vice President and listing the required number of persons to serve as electors. Notification to the Department of State under this subsection shall be made by September 1 of the year in which the election is held. When the Department of State has been so notified, it shall order the names of the candidates nominated by the minor party to be included on the ballot and shall permit the required number of persons to be certified as electors in the same manner as other party candidates.
§ 103.021(4)(a), Fla. Stat. (2003) (emphasis supplied). Neither chapter 103 nor any other chapter in the Florida Statutes defines "national" in this or any related context. We have no specific direction from the Legislature with regard to how it would more particularly define "national."
There are no magic words or numbers to establish precisely what would qualify a party as "national." What is clear, however, is that a party labeling itself a "national party" does not make it so. Reference by the majority to the specific statutes of other states is both meaningless and a red-herring. The Florida Legislature could have selected any number of additional words or elements to impact the word "national" but it did not do so. Florida clearly did not include anything conceivably similar to the specific words chosen by the Legislatures of Hawaii, Iowa or Puerto Rico. Reference to these statutes certainly does not assist the analysis here and seems to be injected simply in an attempt to misdirect attention. Reference to the Hawaii statute, for example, would lead to a result that the Florida term "national" should receive an interpretation that ballot access in only one other state renders a party "national" as a matter of law. In my view, such is an absurd analysis of the word "national." Satisfaction of a single statutory element in Hawaii is far different than attempting to ascertain the meaning of "national" in common usage and understanding. The facts before the trial court did not warrant the conclusion that the Reform Party is a "national" party. Instead, the evidence established and was more demonstrative of a splinter cell of what once was a "national party."
This Court must attempt to understand and apply the broad parameters of what constitutes a "national party" in light of the absence of any further specification for a definition. In devising these parameters, it is necessary to look to the traditional principles of statutory construction. "Because the statute does not define the term [national], the Court must resort to canons of statutory construction in order to derive the proper meaning." Nehme v. Smithkline Beecham Clinical Laboratories, Inc., 863 So.2d 201, 204-05 (Fla.2003) (citing Seagrave v. State, 802 So.2d 281, 286 (Fla.2001)). "One of the most fundamental tenets of statutory construction requires that we give statutory language its *317 plain and ordinary meaning, unless words are defined in the statute or by the clear intent of the legislature." Id. (citing Green v. State, 604 So.2d 471, 473 (Fla.1992)). "When necessary, the plain and ordinary meaning of words can be ascertained by reference to a dictionary." Id. (citing Seagrave, 802 So.2d at 286); see also L.B. v. State, 700 So.2d 370, 372 (Fla.1997) (stating that "a court may refer to a dictionary to ascertain the plain and ordinary meaning which the legislature intended to ascribe to the term").
In addition, this Court must also ensure that laws are enforced with common sense; to do otherwise is to generate disrespect for the law by creating "a morass of technical regulations with no connection to human experience." Mackey v. Household Bank, F.S.B., 677 So.2d 1295 (Fla. 4th DCA 1996); see also United States v. Brown, 333 U.S. 18, 25-26, 68 S.Ct. 376, 92 L.Ed. 442 (1948) ("The canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose. It does not require magnified emphasis upon a single ambiguous word in order to give it a meaning contradictory to the fair import of the whole remaining language.").
The trial court, without the benefit of a specific definition of "national," probed the parameters of what a "national party" holding a "national convention" really was intended to and actually encompassed. Expert testimony at the trial level provided attributes or characteristics of what defines a "national political party" to include but not necessarily be limited to:
(1) the ability to recruit and run national candidates across the country;
(2) the ability to stimulate interest in the political process; (3) the ability to promote, develop, and publicize issues; and (4) the ability to raise money in order to conduct political activities.
The evidence presented at the hearing below revealed that the Reform Party has no substantial funds, does not engage in substantial fundraising or party-building activities, does not actively promote its platform, is highly factionalized, and otherwise does not have a national impact and presence. Specifically, the testimony established that the Reform Party has not run any candidates in Florida since 2002, that there is currently no state activity by the Reform Party-FLA, that there has been no party building or significant fundraising in Florida since the 2000 election; and that the Reform Party filed termination of status notice with the Federal Election Commission.
If the Legislature does not define "national," we must turn to common sense and common understanding of this term. In doing so, it is proper to look to experts in the political arena in defining this term. The trial court considered the opinion testimony of experts offered by the parties in determining the parameters of the characteristics of what constitutes a "national" party in accordance with our precedent. Based on the foregoing, the trial judge had not only competent and substantial evidence to support his findings but also the only evidence presented supported the conclusion that this is not a "national party" within the purview of the controverted statute. In my view, the determinations made by the trial court are eminently correct based on the evidence and arguments presented. The majority, in my view, fails to even consider that there is a factual component as to whether one satisfies the legal criteria of a statute.
We cannot legislate or devise a specific codification of enumerated elements for this statute because that falls within the exclusive province of the Legislature not the Judiciary. For this Court or the trial court to do so would be improper. The *318 Judiciary must, however, give life to the legislative words. The trial court properly probed the parameters of "national party" using the evidence presented. In addition to those considered by the trial court, there are many attributes or characteristics, which are in my view, also indices of a "national political party." Those would include but not be exclusively limited to:
 national structure
 national party organization
 national activities addressing matters of national political importance
 national office
 national constitution or bylaws and whether the entity has followed its national constitution or by laws.
In its advisory opinions, although not directly controlling here, the Federal Election Commission (FEC) applies "a number of criteria to determine whether a political party or its committees have demonstrated sufficient activity on a national level to attain national committee status." Fed. Elect. Comm'n Ad. Op.1998-2, 1998 WL 108619. Although admittedly for different purposes, the main three factors the FEC uses in determining whether a committee qualifies for "national" committee status are:
(1) the party's nomination of candidates for various Federal offices in numerous states;
(2) the party's engagement in certain activities on an ongoing basis (rather than with respect to a particular election) such as supporting voter registration and get-out-the-vote drives;
(3) the party's publicization of issues of importance to the party and its adherents throughout the nation.
Id. Importantly, the FEC has stated that "[a] ... political party will not qualify for national committee status if its activity is focused solely on the Presidential and Vice Presidential election, or if it is limited to one state, or if it currently has only very few Federal candidates on State ballots, or if its Presidential candidate or other candidates have not qualified as candidates as defined in the Act and Commission regulations." Id. (emphasis added) (internal citation omitted).
A simplistic approach by reference to textual material demonstrates that Black's Law Dictionary defines "national" as "[o]f or relating to a nation" and "nationwide in scope." In addition, Black's defines "political party" as "[a]n organization of voters formed to influence the government's conduct and policies by nominating and electing candidates to public office." Moreover, most common and accepted definitions of the word "national" would usually include the notion of being nationwide or countrywide, and normally do not indicate or even allude to the possibility of the concept of "national" being limited to only one or two states, or statewide, or regional, or local. At a minimum, the parameters of what constitutes a national party, most assuredly, must be that the entity or group is an organization of voters formed to influence the government's conduct and policies by nominating and electing candidates to public office that exists throughout the nation. While the concept of "national" does not necessarily require a presence or touch in every geographical location, it certainly must require more than that which the evidence presented here has demonstrated. The facts in this case fail to rise to this level.
The majority refers to what may or may not have existed in 1998 but does not address present fact nor does it enlighten as to present circumstances. In a similar manner, the recitation of other facts by the majority in an attempt to bolster its conclusions fails to follow well established principles. The existence of other evidence is not the basis upon which a trial *319 court's determination of factual issues is to be considered on review.
Notwithstanding that there may be various inflections of what a word may mean, an overly technical approach would result in no word ever having an acceptable or legally sufficient definite meaning or understanding. A word does not necessarily need to be defined by precise elements to have a common understanding. No matter what definition one may establish as to "national" under this statute, there would be a factual question regarding whether the entity or group satisfies that definition, which the majority summarily rejects.
Notwithstanding the foregoing, we must determine whether an appropriate remedy has been ordered in this case. Were the Court to simply affirm the injunction and deny relief to the appellants in this case, a grave inequity would result because it may be properly advanced that the appellants were not afforded adequate notice as to what constituted a "national party" under section 103.021(4)(a), Florida States (2003). It is my view that this lack of notice presents the most serious concern and due process implications that require this Court to direct that Nader and Camejo's names be placed on the November general election ballot, a remedy that has been thoughtfully considered and applied by other courts. See Duke v. Connell, 790 F.Supp. 50, 55-56 (D.R.I.1992); see also Kay v. Mills, 490 F.Supp. 844, 854-55 (E.D.Ky.1980). This is the most practicable solution, which is consistent with the competing interests to be considered. This result preserves the rights of the appellants, the rights of the public, and supports the underlying principles relating to election consideration. This remedy serves to effect a balancing of the important interests and to protect the interests of all affected, including the public.
In affording the appellants relief, it should be noted that unless section 103.021, Florida Statutes (2003), is modified to more specifically define the terms "national party" and "national convention," candidates participating in future elections should be forewarned that they must meet the criteria outlined. Those who fail to do so may be challenged and should ultimately be excluded from the ballot.
ANSTEAD, J., dissenting.
While I agree with the majority that a major impediment to judicial resolution of this case rests on the lack of a precise definition of the terms "national party" and "national convention" contained in section 103.021(4), I cannot agree that the absence of such precision compels us to ignore the requirements of section 103.021(4) altogether. I would approve the trial court's judgment because I believe it was absolutely faithful to the purpose and intent of the Legislature in enacting the provisions of section 103.021(4).
In essence, the trial court held that no matter how narrowly or broadly the terms of the statute are defined, those terms were not met here. Included in the plethora of evidence considered by the trial court of the defunct status of the Reform Party  USA and the Reform Party  Florida were actual written filings by those entities with the Federal Election Commission stating that those parties were inactive and would no longer be participating in federal elections. Of particular concern to the trial court here was the appearance that a defunct party's name was simply being used to get a candidate who was not a member of the party and had not previously been associated it, and who otherwise was not properly qualified, onto the Florida ballot. In other words, the underlying purpose of Florida's statute was being flouted. Because I conclude that the trial court's findings and legal analysis were completely faithful to the terms and especially the spirit of Florida's election *320 laws I would approve the trial court's judgment.
When the Legislature separated the petition and national party affiliation requirements for ballot access in 1999 it clearly made access easier by providing two separate means to access the ballot rather than the more difficult dual requirements of petition and national party affiliation. Having to clear one hurdle rather than two is obviously less difficult. However, the underlying purpose of these provisions remained the same: establishing some reasonable means to assure that those seeking placement on the ballot have established their political viability and legitimacy, whether by securing a certain percentage of voters' endorsement or being associated with a viable national party.
The requirement that persons who want to run for President on Florida's ballot show substantial support, either by a valid signature petition, or by a genuine minor party affiliated with a genuine national party and nomination at a genuine national nominating convention, carries out the Legislature's intent and has been consistently approved over constitutional challenge.
The U.S. Supreme Court has consistently held that states have a compelling interest in the integrity of the ballot and in fair elections in which only candidates with demonstrable support are placed on the ballot. See Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); see also Libertarian Party v. State of Florida, 710 F.2d 790 (11th Cir.1983), cert. denied, 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984) (upholding Florida's petition signature requirement for minor party candidates, which at the time was three percent of registered voters  a substantially more burdensome requirement than the one percent under current section 103.021(3)-(4), Florida Statutes).
In Libertarian Party the Court explained:
[T]he state has an interest in regulating the election process and avoiding voter confusion. That these, and the other interests asserted, are compelling has been well established under decided cases. The Supreme Court stated in Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), that a state has an important interest "in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot  the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process." Id. at 442, 91 S.Ct. at 1976.
710 F.2d at 792-93 (citations omitted) (citing cases upholding signature requirements from one percent up to five percent). Importantly, the Eleventh Circuit also noted that the Supreme Court had stated in Jenness:
When candidates list a party affiliation, however, the voters and the state are entitled to some assurance that particular party designation has some meaning in terms of a "statewide, ongoing organization with distinctive political character." Storer v. Brown, 415 U.S. at 745, 94 S.Ct. at 1286. Requiring a party to meet the 3% requirement on a state basis helps achieve this goal. It protects the party's name and platform against use by unauthorized, truly independent candidates who seek to play off the party's success for their own benefit.
Id. at 795. These observations are particularly appropriate today. By allowing association with a national party to be substituted for a substantial percentage of voters' signatures as a means of gaining *321 ballot access, the Legislature surely contemplated that the relationship be a legitimate one and that the national party be an established party whose credibility would insure the credibility of the candidates associated with the party.
The trial court here reasoned that in enacting section 103.021(4)(a), Florida Statutes, the Legislature surely did not intend the standards for national party, minor party, and national nominating convention to be meaningless. As the trial court noted, "it doesn't seem ... to make any sense that the Legislature would have a provision in the law that says you can get on the ballot as a minor party by getting a ... great number of signatures, and then have another way that's basically no requirements." The trial court was especially concerned that the spirit of the law, in ensuring legitimacy of the national party and its relationship with the candidate, be honored and not manipulated in a way contrary to the Legislature's intent. I commend the trial court for its diligence and faithfulness to the law under extremely trying circumstances. Because I conclude that the trial court "got it right" on the facts and the law, I would approve its judgment.
NOTES
[1] The second complaint also named Governor Jeb Bush and the Reform Party of the United States as defendants. The parties stipulated that Governor Bush should be dismissed as a party to the suit and that Secretary Hood was the only state officer necessary to obtain the requested relief regarding certification. The two complaints were also consolidated by the court because they raised identical issues.
[2] See Dania Jai Alai Int'l, Inc. v. Murua, 375 So.2d 57, 58 (Fla. 4th DCA 1979) (explaining the four-part test for temporary injunctive relief in Florida).
[3] Florida Rule of Appellate Procedure 9.310(b)(2) provides, in pertinent part:

The timely filing of a notice [of appeal] shall automatically operate as a stay pending review, except in criminal cases, when ... any public officer in an official capacity ... seeks review.... On motion, the lower tribunal or the court may extend a stay, impose any lawful conditions, or vacate the stay.
As explained in St. Lucie County v. North Palm Development Corp., 444 So.2d 1133, 1135 (Fla. 4th DCA), review denied, 453 So.2d 45 (Fla.1984), the automatic stay for public officers and public bodies is based on the fact that "planning-level decisions are made in the public interest and should be accorded a commensurate degree of deference and that any adverse consequences realized from proceeding under an erroneous judgment harm the public generally." Nevertheless, courts have the discretion to vacate the automatic stay when "compelling circumstances" require. Id.
[4] This change was made to implement recently adopted article VI, section 1, Florida Constitution. See Fla. S. Comm. on Ethics & Elecs., SB 754 (1999) Staff Analysis 1 (Feb. 8, 1999) (on file with comm.) ("Senate Bill 754 implements the amendment to Article VI, section 1, Florida Constitution, which was approved by the voters in the 1998 General Election."). Article VI, section 1 provides that "the requirements for a candidate with no party affiliation or for a candidate of a minor party for placement of the candidate's name on the ballot shall be no greater than the requirements for a candidate of the party having the largest number of registered voters."
[5] Minor party candidates may also access the ballot as provided in section 103.021(4)(b), Florida Statutes (2003). This section provides:

(b) A minor party that is not affiliated with a national party holding a national convention to nominate candidates for President and Vice President of the United States may have the names of its candidates for President and Vice President printed on the general election ballot if a petition is signed by 1 percent of the registered electors of this state, as shown by the compilation by the Department of State for the preceding general election. A separate petition from each county for which signatures are solicited shall be submitted to the supervisors of elections of the respective county no later than July 15 of each presidential election year. The supervisor shall check the names and, on or before the date of the first primary, shall certify the number shown as registered electors of the county. The supervisor shall be paid by the person requesting the certification the cost of checking the petitions as prescribed in s. 99.097. The supervisor shall then forward the certificate to the Department of State, which shall determine whether or not the percentage factor required in this section has been met. When the percentage factor required in this section has been met, the Department of State shall order the names of the candidates for whom the petition was circulated to be included on the ballot and shall permit the required number of persons to be certified as electors in the same manner as other party candidates.