914 So.2d 1076 (2005)
TAMPA SPORTS AUTHORITY and Henry G. Saavedra, in his capacity as Executive Director of the Tampa Sports Authority, Appellants,
v.
Gordon JOHNSTON, Appellee.
No. 2D05-5302.
District Court of Appeal of Florida, Second District.
November 30, 2005.
*1077 Richard A. Zabak and John Van Voris of Gray Robinson, P.A., Tampa, for Appellants.
John D. Goldsmith of Trenam, Kemker, Schaarf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, Rebecca H. Steele of ACLU Foundation of Florida, Inc., Tampa, and Randall Marshall of ACLU Foundation of Florida, Inc., Miami, for Appellee.

ORDER ON APPELLEE'S MOTION TO VACATE STAY
NORTHCUTT, Judge.
Gordon Johnston has sued the Tampa Sports Authority and its executive director, Henry G. Saavedra (we will refer to them collectively as "the TSA"), seeking to enjoin them from conducting suspicionless patdown searches of every person who attends a Tampa Bay Buccaneers home football game. On November 2, 2005, Johnston obtained a preliminary injunction halting the searches, and the TSA appealed. Upon the filing of the notice of appeal, the preliminary injunction was automatically stayed pursuant to Florida Rule of Appellate Procedure 9.310(b)(2).[1] The circuit court denied Johnston's request to vacate the stay, whereupon he moved this court to do so. We granted the motion on November 4, 2005, and now write to describe our reasons.
The facts set forth in this opinion are taken from undisputed assertions in the parties' filings in this court and below, and from the findings set forth in the injunction order under review in this appeal. As to the latter, we anticipate that in the appeal the TSA may challenge some of the circuit court's fact determinations, and it certainly will dispute that court's conclusions, some of which involve mixed questions of law and fact. As of this writing, however, briefing in the appeal has just begun and we have not been furnished transcripts of the circuit court proceedings on Johnston's motion for a preliminary injunction. Therefore, when deciding the stay issue our understanding of the facts is grounded in the traditional appellate principle that must apply throughout the appealthat is, the order on appeal is presumed correct unless or until the appellant demonstrates otherwise. Smith v. Coal. to Reduce Class Size, 827 So.2d 959, 961 (Fla. 2002).
*1078 The TSA was created by law to, among other things, maintain sports facilities for the benefit of the citizens of Tampa and Hillsborough County. Ch. 65-2307, Laws of Fla. As such, it operates the publicly owned football stadium in Tampa, currently named Raymond James Stadium. The Tampa Bay Buccaneers, a National Football League franchise, plays its home football games at the stadium pursuant to a lease agreement with the TSA. The stadium hosts other events as well, including the home football games of the University of South Florida Bulls. The stadium can accommodate approximately 65,000 attendees, plus support personnel such as vendors, ushers, security staff, and the like.
In August 2005 the NFL declared that all persons attending league games must be physically searched before entering any of the venues where the games are played, the aim being to prevent terrorists from carrying explosives into the stadiums. The Buccaneers requested that the TSA implement this directive at Raymond James Stadium. On September 13, 2005, the TSA obliged by adopting a policy requiring physical searches of all who enter the stadium to attend Buccaneers games. The searches are conducted by contracted private "screeners" who physically pat down each stadiumgoer as he or she enters the gate. Generally, the patdown is performed above the patron's waist. But if the security personnel observe suspicious bulges in the patron's pockets the screener might pat the pockets and instruct the patron to empty them. Anyone found to be carrying contraband is detained while the police are summoned. Anyone who refuses to be patted down is denied entry into the stadium.
Johnston has been a Buccaneers season ticket holder for several years. To become a season ticket holder he was required to pay a seat deposit in addition to the annual price of the tickets. Johnston renewed his season tickets for the 2005 season in the early spring of 2005, at a cost of $869.20 plus $250.00 for stadium parking. At that time Johnston was not given notice that he would have to submit to a patdown search before entering the stadium. When, months later, the TSA adopted the patdown policy, Johnston contacted the Buccaneers to complain. He was told that the Buccaneers would not refund his payment for the season tickets. Moreover, even if Johnston were permitted to return his 2005 tickets for a refund, he would lose the remainder of his seat deposit and be put at the bottom of a 100,000-person waiting list if he desired to purchase season tickets in the future.
When seeking the preliminary injunction Johnston contended that these warrantless searches, unsupported by any individualized suspicion, violated his rights under Article I, Section 12 of the Florida Constitution.[2] After an evidentiary hearing, the circuit court determined that Johnston had established the four factors necessary to obtain a preliminary injunction. Specifically, the court found that (1) Johnston would suffer irreparable harm if the patdowns were not preliminarily enjoined, (2) Johnston would have no adequate remedy at law, (3) there was a substantial likelihood that Johnston would ultimately succeed on the merits of his action, and (4) the public interest would be served by granting the injunction. See Charlotte County v. Vetter, 863 So.2d 465 (Fla. 2d DCA 2004) (describing the four-part test *1079 for obtaining a preliminary injunction in Florida).
At the outset of our discussion, we should clarify the nature of this proceeding. Rule 9.310, governing stays pending review, provides in paragraph (f) that "[r]eview of orders entered by lower tribunals under this rule shall be by the court on motion." By its terms, the paragraph refers generally to any lower court order entered pursuant to the rule. Under this review provision the appellate court would reverse an order only for a legal error or an abuse of discretion on the part of the lower court. But the stay rule contains a more specific provision addressing automatic stays accorded public bodies under rule 9.310(b)(2). The last sentence of that subparagraph states: "On motion, the lower tribunal or the court may extend a stay, impose any lawful conditions, or vacate the stay." (Emphasis supplied.) In the motion before us, Johnston asks us to vacate the stay pursuant to this power. Thus, our purpose here is not to review the circuit court's refusal to vacate the automatic stay; rather, we exercise our own discretion to determine whether to do so. Even so, the result would be the same under either scenario, as will be seen.
Recently, the Florida Supreme Court discussed the application of the automatic stay rule to a state appeal from the dismissal of an involuntary commitment proceeding under the Jimmy Ryce Act. The court identified two principal considerations governing the decision whether to vacate a stay: the likelihood of irreparable harm if the stay is not granted and the likelihood of success on the merits by the entity seeking to maintain the stay. Mitchell v. State, 911 So.2d 1211, 1219 (Fla.2005) (citing Perez v. Perez, 769 So.2d 389, 391 n. 4 (Fla. 3d DCA 1999)).
Here, the first consideration is substantially identical to the first criterion applied by the circuit court when concluding that Johnston was entitled to a preliminary injunction. Obviously, if Johnston proved that he will suffer irreparable harm without an injunction against the patdown searches, he will suffer the same irreparable harm if that injunction is not enforced during this appeal. This is compounded by the fact that all or nearly all of the Buccaneers' 2005 home games likely will have been played before the appeal is completed, thus potentially mooting the issue before us as it relates to Johnston's rights and rendering Johnston's vindication and protection of his constitutional interest wholly illusory. In short, Johnston will have lost his case simply because the TSA filed an appeal. As suggested by the circuit court's findings when granting the injunction, and as more fully discussed below, the likelihood that the TSA would be harmed by keeping the injunction in force during the appeal is far less certain.
The second consideration identified by Mitchell, the likelihood of success on the merits by the entity seeking to maintain the stay, is related to but somewhat different from the criteria applied by the circuit court when granting the injunction. The question here is not strictly whether the circuit court should have entered the injunction, but whether there is a likelihood that the TSA will successfully overturn the injunction on appeal. To do so, the TSA must overcome the appellate presumption of correctness by demonstrating that the injunction was not founded on substantial competent evidence, that it resulted from an incorrect application of law, or that the circuit court abused its discretion when entering it.
At this point, we have little to demonstrate a likelihood that the TSA will succeed on any of these fronts. For his part, Johnston understandably relies on the showing he made in the circuit court as *1080 reflected in the findings of fact and conclusions of law contained in the injunction order. In response to the motion to vacate the stay the TSA notes that it "strongly disagrees" with the circuit court's conclusions, and in the course of this appeal it no doubt will vigorously endeavor to have us join in that disagreement. But on the issue of vacating or maintaining the automatic stay, the TSA concentrates its argument on yet a third consideration mentioned in Mitchell: the balancing of the parties' interests. Mitchell, 911 So.2d at 1216. This consideration essentially requires us to balance, on one hand, the potential harm that would be done to Johnston's interests if the injunction is eventually upheld but has not been enforced during the appeal and, on the other hand, the harm that would be done to the TSA's interests if the injunction is ultimately reversed but has remained in effect during the appeal.
Under the first scenario, during the weeks this appeal will consume before the injunction is affirmed Johnston will be deprived of his constitutional right to be free of unreasonable searches when entering the stadium to attend a Buccaneers game. This harm will be irreparable, and there will be no adequate legal remedy after the fact. The only way Johnston could avoid the unlawful intrusion would be to avoid entering the stadium, thus losing his investment in his 2005 season tickets. Even if he were permitted to return the tickets for a refund, he would forfeit the balance of his seat deposit and, as a practical matter, he would have no opportunity to purchase season tickets in the foreseeable future. Thus, the harm flowing from these options would be irreparable, as well. Assuming Johnston is entitled to the preliminary injunction, staying the injunction during this appeal would entirely deprive him of its benefit and harm his important interests in a way that he has no practical ability to avoid or lessen.
Under the other scenario, the TSA's ability to protect its facility and the safety of those who enter it would be affected by enforcement of an erroneous injunction during the weeks it would take us to reverse it. The importance of that interest cannot be overstated. But how much harm the injunction does to that interest is far from certain.
The patdown searches at issue here are motivated by only a general, though certainly logical, concern that public events at which large crowds gather might be targets of unidentified terrorists. According to the TSA, this supposition stems from recent events in Europe and other places in which terrorists attacked crowds at hotels and on public transportation. It is not based on any specific threat to Raymond James Stadium in particular, or even to professional football venues generally. The hearing on Johnston's motion for preliminary injunction disclosed two prior incidents involving potential threats. One was a telephone call to the TSA that was investigated and determined to be a false alarm. In the other, the press reported that law enforcement had discovered Internet downloads describing two professional football stadiums, neither of them Raymond James Stadium, on computers linked to possible terrorists. As reported in the press, the FBI field office in St. Louis investigated the discovery and determined that it presented no threat or even a potential one. The FBI field director was quoted as saying there was no need to alter attendance policies at NFL games as a result of the incident. Both of these episodes occurred over two years before the TSA adopted its patdown policy.
Leaving aside the amorphous nature of the present danger to the stadium, we *1081 must also examine the degree to which prohibiting these patdown searches would prevent the TSA from averting the danger. When responding to Johnston's motion for a preliminary injunction below, the TSA submitted expert affidavits that described patdown searches as the most effective means of detecting suicide bombs. But the fact remains that the TSA did not institute these searches until two years had passed since the one episode that could be perceived as a specific threat to the stadium. When it finally adopted the patdown policy, it applied it only to Buccaneers games, and not to other stadium events at which large crowds are likely to gather. Even at the Buccaneers games, the searches for the most part are directed only to the patrons' upper bodies.
Conducting patdown searches may well be effective for detecting arms or explosives. But forgoing the searches during this appeal would leave the TSA in roughly the same position it maintained during the two years following the specific threat to the stadium and that it continues to maintain for all non-Buccaneers events. Moreover, the circumstances of this case suggest that conducting the searches may furnish only a marginal improvement in the safety already afforded by other means that have been in place until now and that the TSA continues to deem sufficient other than at Buccaneers games.
This brings us to our last consideration in this balancing test. Precluding these patdown searches would not leave the TSA wholly without an ability to protect the stadium and its visitors. To the contrary, the TSA has in place a number of other measures to protect against a variety of security threats, including the specific one at issue here. In this regard, the TSA has furnished us a recent unclassified information bulletin from the United States Department of Homeland Security addressing potential threats to tourist facilities. Referencing recent suicide bombings at hotels in Indonesia, the bulletin reiterates prior warnings that tourist destinations, including sporting events, might be attractive targets of terrorist attacks. While noting that currently there is no credible or specific intelligence regarding the possibility of such attacks in the United States, the bulletin lists a number of security measures that should be taken in such places, and it recommends additional methods of achieving enhanced security. Notably, neither the basic recommendations nor the enhanced ones include patdown searches.
Applying the two balancing tests mentioned in Mitchell, we conclude that both weigh heavily in favor of vacating the automatic stay. But the TSA contends that this is not the end of our inquiry. It points to a body of Florida case law, not mentioned in Mitchell, holding that an automatic stay in effect during an appeal by the government should be vacated only in the most "compelling circumstances." This seems to have been the test applied by the circuit court when it denied Johnston's motion to vacate the stay; in its order the court wrote that Johnston had not "demonstrated such compelling circumstances as to support the vacating of the stay." We disagree.
Apparently, what constitutes compelling circumstances for this purpose has never been articulated. The test originated in St. Lucie County v. North Palm Development Corp., 444 So.2d 1133 (Fla. 4th DCA 1984). As far as we can tell, it has been mentioned in three other reported Florida decisions. In one of those cases the Florida Supreme Court referred to the compelling circumstances test in a footnote containing a general discussion of rule 9.310(b)(2), but the court did not expound on it or further discuss its application. *1082 Reform Party of Fla. v. Black, 885 So.2d 303, 306 n. 3 (Fla.2004).
Gervais v. City of Melbourne, 890 So.2d 412 (Fla. 5th DCA 2004), likewise is unhelpful. In that case the Fifth District upheld the circuit court's refusal to vacate the automatic stay of an order dismissing the city's petition to forfeit Gervais's property, which the city had seized and which it continued to hold during the appeal. The Fifth District rejected Gervais's assertion that the automatic stay did not apply to forfeiture proceedings. It also noted that the automatic stay could be vacated under compelling circumstances, but it held the circuit court had not abused its discretion by declining to do so. Id. at 414-15.
Gervais was vastly different from our case. As the Gervais court observed, if the city lost the appeal Florida's forfeiture law would require it to pay Gervais for the lost value of her property and the lost income she suffered as a result of being deprived of her property during the appeal. Id. at 414. Under those circumstances, we doubt it would have been proper to vacate the stay even in the absence of the compelling circumstances test. As we have seen, in our case the harm to Johnston's interests is incapable of being remedied after the fact.
In Department of Environmental Protection v. Pringle, 707 So.2d 387 (Fla. 1st DCA 1998), the First District reinstated an automatic stay after the circuit court had vacated it. That case, too, differed widely from this one. Pringle involved a commercial fisherman's suit for a declaratory judgment and an injunction based on his alleged uncertainty about the legality of a certain type of fishing net under the "net ban" provisions of the Florida Constitution. The circuit court preliminarily enjoined enforcement of the ban against the subject net pending resolution of the declaratory judgment action. Then, when the Department of Environmental Protection appealed the injunction, the circuit court vacated the automatic stay. But it did not do so on the basis of a balancing of interests affected by the injunction that was under review in the appeal. Rather, it vacated the stay in order to calm rising tensions in the local commercial fishing community. Id. at 390.
When reinstating the stay, the First District pointed out that the compelling circumstances test placed the burden of proving those circumstances on the party seeking to vacate the stay. Id. There, the appellee had simply submitted a motion to vacate the stay with an accompanying affidavit attesting to the tensions in the community. The motion also referred to testimony on the same subject that had been proffered, but not actually presented, at the hearing on the motion for preliminary injunction. The circuit court vacated the stay solely on the basis of the motion, without holding a hearing or permitting a response. Id. at 389.
On the limited evidence, the First District found "no compelling reason to vacate the automatic stay." 707 So.2d at 390.
The trial court apparently believed that it was appropriate to enjoin enforcement of the net ban against persons using this type of net because of "rising tensions" between the fishermen and the law enforcement officers and the implied possibility of violence. Appellees, however, have provided us no authority for such a ruling.
Id. The court also observed that vacating the stay for that purpose "could have the effect of encouraging parties to threaten violence to obtain the result they seek from a judicial tribunal." Id.
Thus, in Pringle the order vacating the stay suffered from three infirmities: it lacked an evidentiary basis; its legal *1083 premise was questionable, based on considerations wholly outside the interests at stake in the litigation; and it established a bad policy precedent by rewarding misconduct. As in Gervais, the order vacating the stay in Pringle certainly would not have been sustained even without the compelling circumstances test.
The only case in which we find meaningful instruction on applying the compelling circumstances test is the one in which the test was devised, North Palm Development, 444 So.2d 1133. There, in a suit by land developers, the circuit court entered a judgment declaring that portions of St. Lucie County's comprehensive zoning plan were unconstitutional and that the developers' site plan application met the county's requirements as modified by the court. When the county appealed, the circuit court vacated the automatic stay. The Fourth District then reviewed the vacation order on the county's motion. Id. at 1134.
The court suggested that the reason for the automatic stay stemmed from the fact that planning-level governmental decisions are made in the public interest and are entitled to "a commensurate degree of deference." Id. at 1135. Further, "any adverse consequences realized from proceeding under an erroneous judgment harm the public generally." Id. Given that rationale for automatically staying such judgments, the court wrote, "we believe the stay should be vacated only under the most compelling circumstances." Id.
Turning to the facts of that case, the court noted that the circuit court had felt there was a serious possibility the developers would suffer substantial damage due to the delay resulting from the appeal, but it did not believe the county would suffer much damage if the developers completed their improvements but lost the appeal. "If this assessment of the possibilities was accurate one would have to say the balance of equities would be overwhelmingly tilted in favor of the developers and vacation of the stay was indicated." Id. But the appellate court did not believe the circuit court's assessment was correct. To the contrary, the court concluded that the county likely would be severely damaged if the developers lost the appeal after constructing substantial improvements on the property and thereafter found it economically unfeasible or impossible to remove them. For these reasons, the court concluded the circuit court had abused its discretion by vacating the automatic stay. Id. at 1134-35.
Thus, in North Palm Development the court did not find compelling circumstances justifying a vacation of the stay where it was clear that both parties were at significant risk of being damaged during the appeal. But in our case the balance of equities is, to use the Fourth District's phrase, "overwhelmingly tilted." If the stay were to remain in force during this appeal, Johnston would suffer definite, irreparable, and irremediable harm to his important constitutional interests each time the Buccaneers play at home. He would have no ability to avoid or lessen that harm. And even if he were to successfully defend the injunction in this appeal, the expiration of the 2005 season in the meantime would completely deprive him of its benefit.
On the other hand, the harm to the TSA's interests that would be occasioned by lifting the stay is uncertain at most. The TSA would be left in the same posture it chose to maintain in the years preceding the search policythe same one it continues to maintain for non-Buccaneers eventsemploying an array of other measures to protect the stadium and its occupants from a possible, general danger that it has in common with any number of other gathering places across the country. *1084 Moreover, the conclusion of the 2005 Buccaneers season during this appeal would not moot the TSA's effort to vindicate its policy for future purposes.
The North Palm Development court correctly recognized that the automatic stay rule is founded in judicial deference to planning-level governmental decisions. But that court also acknowledged that this deference diminishes where, as here, the equities are overwhelmingly tilted against maintaining the stay.
We conclude that the balancing tests described by the supreme court in Mitchell and the compelling circumstances test espoused by the Fourth District in North Palm Development call for vacation of the automatic stay in this case. Accordingly, the stay is vacated and the preliminary injunction under review in this appeal shall remain in force until further order of this court.
FULMER, C.J., and KELLY, J., Concur.
NOTES
[1] (2) Public Bodies; Public Officers. The timely filing of a notice shall automatically operate as a stay pending review, except in criminal cases, when the state, any public officer in an official capacity, board, commission, or other public body seeks review; provided that an automatic stay shall exist for 48 hours after the filing of the notice of appeal for public records and public meeting cases. On motion, the lower tribunal or the court may extend a stay, impose any lawful conditions, or vacate the stay.
[2] "SECTION 12. Searches and seizures. The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures . . . shall not be violated. . . ."